JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

County in which action arose: **Washtenaw County**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
1 800 WATER DAMAGE International, LLC

**DEFENDANTS**
MTS Restoration, LLC, Shelly Seese and Brian Seese

**(b)** County of Residence of First Listed Plaintiff    Washtenaw County, MI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Mahonin County, OH
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey Zucker, FISHER ZUCKER, LLC, 21 South 21st Street, Philadelphia, PA 19103,
(215) 825-3100

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [x] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
The Lanham Act, 15 U.S.C. § 1051
Brief description of cause:
Trademark infringement and breach of franchise agreement

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 27,518.77

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
December 29, 2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?            ☐ Yes
                                                                          ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously            ☐ Yes
            discontinued or dismissed companion cases in this or any other          ☒ No
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


Notes :

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

1 800 WATER DAMAGE
INTERNATIONAL, LLC,

               Plaintiff,

v.

MTS RESTORATION, LLC, SHELLY
SEESE AND BRIAN SEESE

               Defendants.

**CIVIL ACTION**

**No.**

## COMPLAINT

## PARTIES

1.    Plaintiff 1 800 WATER DAMAGE International, LLC ("1-800 WATER DAMAGE") is a Delaware limited liability company with its principal place of business at 731 Fairfield Court, Ann Arbor, Michigan 48108.

2.    Defendant MTS Restoration, LLC ("MTS") is an Ohio limited liability company with its principal place of business at 8302 Southern Blvd., #2B, Boardman, Ohio 44512.

3.    Defendants Shelly and Brian Seese (collectively, the "Seeses") are adult individuals and husband and wife with an address at 459 Springfield Road, Columbiana, Ohio 44408. Upon information and belief, the Seeses own one hundred percent of the membership interest in MTS.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the parties and subject matter in this civil action pursuant to 28 U.S.C. § 1331 in that Defendants are infringing on Plaintiff's trademark rights in violation of the Lanham Act, 15 U.S.C. § 1051, et seq.

5.     Defendants have had continuous contacts with 1-800 WATER DAMAGE's headquarters in Michigan pursuant to the Franchise Agreement (defined below).  Further, this lawsuit arises out of and is related to Defendants' contacts with 1-800 WATER DAMAGE's headquarters in Michigan.

6.     Venue for this action is predicated upon 28 U.S.C. § 1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## THE PARTIES' RIGHTS AND OBLIGATIONS UNDER
## THE FRANCHISE AGREEMENT

7.     Plaintiff 1-800 WATER DAMAGE is the franchisor of 1-800 WATER DAMAGE franchises, which offer water restoration services, carpet cleaning services, mold remediation, odor removal and related cleaning services and ancillary products under the "1-800 WATER DAMAGE®" name and mark (the "Mark").

8.     On March 2, 2006, Shelly Seese, Marian Morrow and Tom Lavender entered into a franchise agreement (the "Franchise Agreement") with 1-800

WATER DAMAGE's predecessor in interest, Cure Service Group, Inc., pursuant to which Shelly Seese, Marian Morrow and Tom Lavender were granted the right and undertook the obligation to operate a 1-800 WATER DAMAGE franchise (the "Franchised Business") within certain zip codes in and around Columbiana, Ohio (the "Marketing Area") for a term of ten years (the "Term"). A true and accurate copy of the Franchise Agreement is attached as "Exhibit A."

9.   Thereafter the Franchised Business was operated by Shelly Seese, Marian Morrow and Tom Lavender through MTS. Additionally, the Marketing Area was expanded to include certain zip codes in western Pennsylvania.

10.   On March 2, 2016, 1-800 WATER DAMAGE and Shelly Seese, Marian Morrow and Tom Lavender entered into an Addendum to the Franchise Agreement which removed Marian Morrow and Tom Lavender as parties to the Franchise Agreement effective December 31, 2015.

11.   Also on March 2, 2016, 1-800 WATER DAMAGE, the Seeses entered into an Amendment to the Franchise Agreement (the "Amendment") which added Brian Seese as a party to the Franchise Agreement wherein Brian Seese agreed to be bound by and perform all obligations under the Franchise Agreement. The Amendment also extended the Term to June 30, 2016.

12.   On June 30, 2016, the Franchise Agreement expired.

3

13.     Pursuant to Section 15.1 of the Franchise Agreement, within 15 days of the expiration of the Franchise Agreement, Defendants were required to pay to 1-800 WATER DAMAGE all royalty fees and other amounts owed to 1-800 WATER DAMAGE, including interest on past due amounts.

14.     Pursuant to Section 15.2 of the Franchise Agreement, immediately upon the expiration of the Franchise Agreement, Defendants were required to cease using the Mark.

15.     Pursuant to Section 15.4 of the Franchise Agreement, immediately upon the expiration of the Franchise Agreement, Defendants were required to comply with their post-termination obligation not to compete which prohibits Defendants for a period of 36 months from June 30, 2016, within a 75 mile radius of the Marketing Area or any other 1-800 WATER DAMAGE franchisee's marketing area in existence as of the date of expiration, from:

> a. Having any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business; and
>
> b. Performing services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business.

16.     Pursuant to Section 7.2 of the Franchise Agreement, a "Competitive Business" means "any business operating, or granting franchises or licenses to

4

others to operate, any business which provides water damage restoration services and/or products or related services and/or products or which is similar to the [Franchised Business]. . ."

## BREACH OF POST-EXPIRATION OBLIGATIONS UNDER THE FRANCHISE AGREEMENT

17.   On July 19, 2016, 1-800 WATER DAMAGE notified Defendants of their post-expiration obligations under the Franchise Agreement, including, without limitation, to cease using the Mark, cease operating the Franchise Business and pay all amounts due to 1-800 WATER DAMAGE.

18.   In or around September 2016, Defendants provided 1-800 WATER DAMAGE with certain requested documentation in connection with Defendants' post-expiration obligations under the Franchise Agreement.

19.   Thereafter, 1-800 WATER DAMAGE noticed discrepancies in the gross sales previously reported to 1-800 WATER DAMAGE by Defendants and notified Defendants that they owe 1-800 WATER DAMAGE $18,941.80 in unpaid royalty fees, plus interest in the amount of 18% per year.

20.   1-800 WATER DAMAGE demanded payment of the unpaid royalty fees and interest.

21.   To date, Defendants have failed to pay the unpaid royalty fees and interest.

22.     Defendants are operating a Competitive Business in breach of the covenant not to compete.

23.     Defendants are using the Mark in connection with their Competitive Business.

## COUNT ONE
## Trademark Infringement, Unfair Competition and Unfair Trade Practice

24.     1-800 WATER DAMAGE incorporates the averments contained in paragraphs 1 through 23 as if fully set forth in this paragraph.

25.     Defendants are not authorized to use the Mark.

26.     Defendants are operating a Competitive Business under the Mark and are falsely representing an affiliation with 1-800 WATER DAMAGE.

27.     Defendants are willfully trading on the reputation of and cause dilution of the Mark.

28.     Defendants are guilty of trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1051, et seq.  Defendants' use of the Mark constitutes a false designation of origin and is likely to cause confusion, mistake or deception as to being affiliated, connected or associated with Plaintiff in violation of 15 U.S.C. §1125(a). Defendants' conduct is also a violation of the common law of unfair competition and is an unfair trade practice under common law.

29.     Defendants' continued operation as set forth above has caused and will cause Plaintiff irreparable injury in that customers are being deceived by Defendants

as a result of Defendants' unlawful use of the Mark; business will be diverted from Plaintiff; the Mark will be diluted; and Plaintiff will lose profits and revenues which, because of Defendants' conduct, cannot be readily calculated.

30.    Plaintiff has no adequate remedy at law because Plaintiff cannot be adequately compensated for the deprivation and dilution of the consumer recognition and goodwill built up under the Mark as a result of Defendants' conduct.

31.    Plaintiff's immediate and irreparable harm will continue unless Defendants are enjoined from continuing to use of the Mark.

**WHEREFORE,** 1 800 WATER DAMAGE International, LLC demand judgment in their favor and against Defendants MTS Restoration, LLC, Shelly Seese and Brian Seese, jointly and severally, as follows:

a.  A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from using the Mark or any colorable imitation in any manner whatsoever;

b.  An accounting of and judgment for the profits to which Plaintiff may be entitled;

c.  Treble profits or damages, whichever is greater, pursuant to 15 U.S.C. § 1117;

d.  An order requiring Defendants to deliver and/or destroy all labels, signs, prints, packages, wrappers, receptacles and advertisements in their possession

7

bearing the word and/or symbol that is the subject of the trademark or trade name violation or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same pursuant to 15 U.S.C. §1118;

      e. Punitive damages;

      f. Attorney's fees;

      g. Costs of this action; and

      h. Such further relief as this Court deems just and proper.

## COUNT TWO
## Breach of the Franchise Agreement

32.    1-800 WATER DAMAGE incorporates the averments contained in paragraphs 1 through 31 as if fully set forth in this paragraph.

33.    At all times referred to herein, 1-800 WATER DAMAGE was in compliance with the Franchise Agreement and had fulfilled all of its obligations pursuant to the terms and conditions thereof.

34.    Defendants breached the Franchise Agreement by failing to make the required royalty payments due under the Franchise Agreement and failing to comply with their post-termination obligations to cease use of the Marks and not to compete.

35.    Defendants were notified in writing of the amounts due under the Franchise Agreement.

36.     Defendants were notified in writing that they were required to cease use of the Marks and cease the operation of their Competitive Business.

37.     Although Defendants were given opportunities to cure their breaches of the Franchise Agreement, Defendants have failed to do so.

38.     Pursuant to Section 17.9 of the Franchise Agreement, Defendants are responsible for reimbursing 1-800 WATER DAMAGE for all costs and expenses it incurs, including reasonable attorney's fees and related fees, in the event that Defendants fail to comply with the terms of the Franchise Agreement.

39.     Due to Defendants' breaches under the Franchise Agreement, 1-800 WATER DAMAGE has been damaged in the amount of at least $27,518.77 in outstanding royalty fees and interest, plus lost profits and other damages in connection with Defendants' operation of its Competitive Business, together with interest, attorney's fees and costs.

**WHEREFORE,** 1 800 WATER DAMAGE International, LLC demands judgment in its favor and against Defendants MTS Restoration, LLC, Shelly Seese and Brian Seese, jointly and severally, as follows:

a.     A preliminary injunction and permanent injunction enjoining Defendants from owning or operating their Competitive Business for 36 months;

9

b.    An accounting of and judgment for the royalties, other fees, profits and other damages to which 1 800 WATER DAMAGE International, LLC is entitled, which amount is currently unknown but will likely exceed $27,518.77;

c.    Transfer of the telephone number (330) 629-8568 to 1-800 WATER DAMAGE;

d.    Interest;

e.    Attorney's fees;

f.    Costs of this action; and

g.    Such further relief as this Court deems appropriate.

### COUNT THREE
### Accounting

40.    1-800 WATER DAMAGE incorporates the averments contained in paragraphs 1 through 39 as if fully set forth herein at length.

41.    The amount of revenue generated by the Defendants from operating the Franchised Business and their Competitive Business is peculiarly within the knowledge of the Defendants, and 1-800 WATER DAMAGE requires an accounting of the amount of such revenues prior to ascertaining its damages as a result of the Defendants' wrongful activities.

**WHEREFORE,** 1 800 WATER DAMAGE International, LLC demands judgment in its favor and against Defendants MTS Restoration, LLC, Shelly Seese and Brian Seese, jointly and severally, as follows:

10

     a.     An accounting of Defendants' gross revenues of the Franchised Business and their Competitive Business, profits of the Competitive Business and royalty fees, other fees and interest due under the Franchise Agreement, including, without limitation;

     b.     Attorney's fees;

     c.     Costs of this action;

     d.     Interest; and

     e.     Such further relief as this Court deems appropriate.

**FISHER ZUCKER, LLC**

Date:     December 29, 2016     By:     /s/ Jeffrey Zucker
     Jeffrey Zucker
     Priya Vimalassery
     21 South 21st Street
     Philadelphia, PA 19103
     (215) 825-3100
     jzucker@fisherzucker.com
     pvimalassery@fisherzucker.com
     Attorneys for Plaintiff, 1 800
     WATER DAMAGE International,
     LLC

11

# EXHIBIT  A

# 1-800-WATER DAMAGE™

# FRANCHISE AGREEMENT

# TABLE OF CONTENTS

1. PREAMBLES, ACKNOWLEDGEMENTS AND GRANT OF FRANCHISE ............... 1

    1.1. PREAMBLES ............................................................................................... 1
    1.2. ACKNOWLEDGMENTS ............................................................................ 1
    1.3. REPRESENTATION ................................................................................... 2
    1.4. CORPORATE OR PARTNERSHIP FRANCHISEE .................................. 2
    1.5. GRANT OF FRANCHISE ........................................................................... 3
    1.6. YOUR PERFORMANCE ............................................................................ 3
    1.7 TERRITORY ................................................................................................ 3
    1.8. TOLL FREE 1-800-WATER DAMAGE NUMBER ..................................... 4
    1.9. CONDUCTING BUSINESS OUTSIDE OF THE TERRITORY ................ 4
    1.10 REFERRALS ............................................................................................... 5
    1.11. NATIONAL OR REGIONAL ACCOUNTS ............................................... 5
    1.12. NATURAL DISASTERS ............................................................................ 5
    1.13. RIGHTS WE RESERVE ............................................................................. 5

2. LOCATION SELECTION, LEASE OF LOCATION AND BUSINESS ........................... 6

    2.1. LOCATION SELECTION ........................................................................... 6
    2.2. LEASE OF LOCATION .............................................................................. 6
    2.3. BUSINESS DEVELOPMENT .................................................................... 7
    2.4. REQUIRED PURCHASES ......................................................................... 7
    2.5. YOUR OBLIGATIONS .............................................................................. 8
    2.6. BUSINESS COMMENCEMENT ............................................................... 8
    2.7. COMMENCEMENT DEADLINE ............................................................. 8
    2.8. INITIAL LOCAL MARKETING ................................................................ 8

3. FEES .......................................................................................................................... 9

    3.1. INITIAL FRANCHISE FEE ....................................................................... 9
    3.2. ADDITIONAL MARKETING AREA AND FEE ...................................... 9
    3.3. ROYALTY ................................................................................................. 10
    3.4. DEFINITION OF "GROSS REVENUE" ................................................. 10
    3.5. INTEREST ON LATE PAYMENTS ........................................................ 10
    3.6. APPLICATION OF PAYMENTS ............................................................ 11
    3.7. SERVICE FEE .......................................................................................... 11
    3.8. PROCESSING FEE AND TOLL CHARGES .......................................... 11

4. TRAINING AND COMMENCEMENT ASSISTANCE ............................................. 11

    4.1. TRAINING ............................................................................................... 11
    4.2. REFRESHER TRAINING ........................................................................ 12
    4.3. GENERAL GUIDANCE .......................................................................... 12
    4.4. ADDITIONAL GUIDANCE .................................................................... 12
    4.5. OPERATIONS MANUAL ........................................................................ 13

5.    MARKS .......................................................................................................... 14
      5.1.    OWNERSHIP AND GOODWILL OF MARKS .................................. 14
      5.2.    LIMITATIONS ON YOUR USE OF MARKS ..................................... 14
      5.3.    NOTIFICATION OF INFRINGEMENTS AND CLAIMS ................. 14
      5.4.    MODIFICATION / DISCONTINUANCE OF USE OF MARKS ........ 15

6.    CONFIDENTIAL INFORMATION ............................................................. 15
      6.1.    DEFINITION OF CONFIDENTIAL INFORMATION ..................... 15
      6.2.    FOR BUSINESS USE ONLY ............................................................ 15
      6.3.    IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS ................... 16

7.    EXCLUSIVE RELATIONSHIP .................................................................... 16
      7.1.    EXCLUSIVE DEALINGS .................................................................. 16
      7.2.    COMPETITIVE BUSINESS .............................................................. 16

8.    METHODS OF OPERATION ...................................................................... 17
      8.1.    COMPLIANCE WITH METHODS OF OPERATION ....................... 17
      8.2.    PROVISIONS OF THIS AGREEMENT ............................................ 18
      8.3.    MODIFICATION OF METHODS OF OPERATION ......................... 18
      8.4.    OPERATION OF THE SYSTEM ....................................................... 18
      8.5.    AUTHORIZED PRODUCTS AND SERVICES ................................ 21
      8.6.    GROUP PURCHASING REBATES .................................................. 21
      8.7.    CAPITAL .......................................................................................... 21
      8.8.    INSURANCE ..................................................................................... 21
      8.9.    GROUP INSURANCE ....................................................................... 22
      8.10.   MANAGER ........................................................................................ 22

9.    MARKETING ............................................................................................... 22
      9.1.    BY US ............................................................................................... 22
      9.2.    ACCOUNTING .................................................................................. 23
      9.3.    PROPORTIONALITY ........................................................................ 23
      9.4.    DEFERRALS OR REDUCTIONS ...................................................... 24
      9.5.    BY YOU ............................................................................................ 24
      9.6.    PROOF OF EXPENDITURE ............................................................. 24
      9.7.    TELEPHONE LISTINGS ................................................................... 24
      9.8.    MEDIA APPEARANCES ................................................................... 25
      9.9.    SOLICITATION OF NEW FRANCHISEES ...................................... 25
      9.10.   CUSTOMER WARRANTIES ............................................................ 25
      9.11.   NOTHING BUT THE TRUTH .......................................................... 25

10.   RECORDS, REPORTS AND FINANCIAL STATEMENTS ......................... 25
      10.1.   BOOKKEEPING ............................................................................... 25
      10.2.   VERIFICATION ................................................................................ 26

11.    INSPECTIONS AND AUDITS ........................................................................ 26
    11.1.  OUR RIGHTS TO INSPECT THE BUSINESS ................................. 26
    11.2.  COOPERATION ................................................................................. 26
    11.3.  OUR RIGHT TO AUDIT ................................................................... 27

12.    TRANSFER ................................................................................................... 27
    12.1.  BY US ................................................................................................ 27
    12.2.  BY YOU ............................................................................................. 27
    12.3.  CONDITIONS FOR APPROVAL OF TRANSFER ........................... 28
    12.4.  TRANSFER TO A CORPORATION OR LIMITED LIABILITY
            COMPANY WHOLLY OWNED BY YOU ........................................ 29
    12.5.  TRANSFER UPON YOUR DEATH OR DISABILITY ...................... 30
    12.6.  OPERATION UPON YOUR DEATH OR DISABILITY .................... 30
    12.7.  EFFECT OF CONSENT TO TRANSFER .......................................... 31
    12.8.  *BONA FIDE* OFFERS ...................................................................... 31
    12.9.  OUR RIGHT OF FIRST REFUSAL ................................................. 31
    12.10. EXERCISE ......................................................................................... 32
    12.11. NON-EXERCISE ................................................................................ 32

13.    EXPIRATION OF THIS AGREEMENT ...................................................... 32
    13.1.  ACQUISITION OF A SUCCESSOR FRANCHISE ........................... 33
    13.2.  GRANT OF A SUCCESSOR FRANCHISE ...................................... 33
    13.3.  OUR NOTICE .................................................................................... 33
    13.4.  NO GRANT ....................................................................................... 33
    13.5.  90 DAY CURE ................................................................................... 34
    13.6.  AGREEMENTS/RELEASES ............................................................. 34

14.    TERMINATION OF AGREEMENT ........................................................... 34
    14.1.  BY YOU ............................................................................................. 34
    14.2.  BY US ................................................................................................ 34
    14.3.  SALES QUOTA ................................................................................. 36

15.    OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR
    EXPIRATION OF THIS AGREEMENT ...................................................... 37
    15.1.  PAYMENT OF AMOUNTS OWED TO US AND ASSIGNMENT OF
            CUSTOMER ACCOUNTS ................................................................. 37
    15.2.  MARKS .............................................................................................. 37
    15.3.  CONFIDENTIAL INFORMATION .................................................. 38
    15.4.  COVENANT NOT TO COMPETE .................................................... 39
    15.5.  COMMENCEMENT BY ORDER ...................................................... 39
    15.6.  OUR RIGHT TO PURCHASE BUSINESS PROPERTY ................... 39
    15.7.  CONTINUING OBLIGATIONS........................................................ 41

16.  RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION ................................ 41
     16.1.  INDEPENDENT CONTRACTORS ......................................................... 41
     16.2.  NO LIABILITY FOR ACTS OF OTHER PARTY ................................. 41
     16.3.  TAXES ................................................................................................. 41
     16.4.  INDEMNIFICATION ........................................................................... 41
     16.5.  MITIGATION NOT REQUIRED .......................................................... 42

17.  ENFORCEMENT ........................................................................................ 42
     17.1.  SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS ............ 42
     17.2.  LESSER COVENANT ENFORCEABLE ................................................ 42
     17.3.  GREATER NOTICE ............................................................................ 42
     17.4.  WAIVER OF OBLIGATIONS ............................................................... 43
     17.5.  NON-WAIVER .................................................................................... 43
     17.6.  *FORCE MAJEURE* ............................................................................ 43
     17.7.  EXTEND PERFORMANCE .................................................................. 44
     17.8.  OUT OF STOCK AND DISCONTINUED ............................................. 44
     17.9.  COSTS AND ATTORNEYS' FEES ...................................................... 44
     17.10. YOU MAY NOT WITHHOLD PAYMENTS DUE TO US ......................... 44
     17.11. RIGHTS OF PARTIES ARE CUMULATIVE ........................................ 44
     17.12. DISPUTE RESOLUTION ..................................................................... 44
            17.12.1.  MEDIATION ........................................................................ 44
            17.12.2   ARBITRATION ..................................................................... 45
     17.13. GOVERNING LAW .............................................................................. 46
     17.14. CONSENT TO JURISDICTION ........................................................... 46
     17.15. WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL ...................... 46
     17.16. BINDING EFFECT .............................................................................. 47
     17.17. LIMITATIONS OF CLAIMS ................................................................. 47
     17.18. CONSTRUCTION ................................................................................ 47
     17.19. WITHHOLD APPROVAL ..................................................................... 47
     17.20. THIRD PARTY BENEFICIARIES ........................................................ 47
     17.21. INJUNCTIVE RELIEF ......................................................................... 47
     17.22. HEADINGS ......................................................................................... 48
     17.23. WE, US, OUR ..................................................................................... 48
     17.24. JOINT AND SEVERAL OWNERS' LIABILITY .................................... 48
     17.25. "BUSINESS" ....................................................................................... 48
     17.26. MULTIPLE COPIES ............................................................................ 48
     17.27. POWER OF ATTORNEY ..................................................................... 48
     17.28. "CORPORATION OR PARTNERSHIP" ............................................... 49

18.  NOTICES AND PAYMENTS ...................................................................... 49
     18.1.  NOTICES ............................................................................................ 49
     18.2.  PAYMENTS ........................................................................................ 49

19.  MISCELLANEOUS ................................................................................... 49

19.1.   NO AUTHORITY ............................................................. 49
19.2.   RECEIPT ....................................................................... 50
19.3.   OPPORTUNITY FOR REVIEW BY YOUR ADVISORS ................................. 50

1-800-WATER DAMAGE™
FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into this _2nd_ day of March , 2006, by and between The Cure Service Group, Inc., a corporation formed under Washington law, with its principal business address at 1167 Mercer Street, Seattle, Washington 98109 (referred to in this Agreement as "we", "us" or "our"), and Marian Morrow, Shelly Seese, and Tom Lavender whose principal business address is 459 Springfield Rd., Columbiana, OH 44408 (referred to in this Agreement as "you", "your" or "owner").

## 1.   PREAMBLES, ACKNOWLEDGEMENTS AND GRANT OF FRANCHISE.

**1.1.   PREAMBLES.**   We have expended considerable time and effort in developing a franchise that provides water damage restoration services, carpet cleaning services, related cleaning services, and ancillary products ("Water Damage Services and Products"). These businesses operate under the **1-800-WATER DAMAGE™** name and under distinctive business formats, methods, procedures, designs, layouts, standards and specifications, all of which we may improve, further develop or otherwise modify from time to time. We use, promote and license certain trademarks, service marks and other commercial symbols in the operation of **1-800-WATER DAMAGE** businesses, including the **1-800-WATER DAMAGE** trademarks and service marks and associated logo (collectively, the "Marks"). We grant franchises to persons who meet our qualifications and who are willing to undertake the investment and effort required to own and operate a **1-800-WATER DAMAGE** business offering the services and products we authorize and approve and utilizing our business formats, methods, procedures, signs, designs, layouts, equipment, standards and specifications and the Marks (the "System"), irrespective of the media we use to document the System. You have indicated to us by your actions and statements that you are desirous of a franchise to own and operate a **1-800-WATER DAMAGE** business. The Marks, together with the System and the franchise license granted herein are referred to collectively herein as the "BUSINESS."

**1.2.   ACKNOWLEDGMENTS.**   You acknowledge that you have read this Agreement and our Franchise Offering Circular and understand and accept the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain our high standards of quality and service and the uniformity of those standards at each **1-800-WATER DAMAGE** business and thereby to protect and preserve the goodwill of the Marks. You acknowledge that you have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that, like any other business, the nature of the business conducted by a **1-800-WATER DAMAGE** business may evolve and change over time, that an investment in a **1-800-WATER DAMAGE** business involves business risks and that your business abilities and efforts are vital to the success of the venture. Any information you acquire from other **1-800-WATER DAMAGE** franchisees relating to their sales, profits or cash flows does not constitute

information obtained from us, nor do we make any representations as to the accuracy of any such information. All business dealings between you and our officers, directors and employees as a result of this Agreement are solely between you and us. You further acknowledge that we have advised you to seek franchise counsel to review and evaluate this Agreement.

1.3.    **REPRESENTATION.** You represent to us, as an inducement to our entry into this Agreement, that all statements you have made and all materials you have submitted to us in connection with your purchase of the franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise. We have approved of your purchasing a franchise in reliance upon all of your representations.

1.4.    **CORPORATE OR PARTNERSHIP FRANCHISEE**. If you are at any time a corporation or partnership, you agree and represent that:

  1.4.1.   You will have the authority to execute, deliver and perform your obligations under this Agreement and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation. You will notify us within five (5) days whenever there is a change in your corporate status or whenever you receive service of process for any reason;

  1.4.2.   Your organizational documents or partnership agreement will recite that the issuance and transfer of any ownership interests in you are restricted by the terms of this Agreement, and all certificates and other documents representing ownership interests in you will bear a legend referring to the restrictions of this Agreement;

  1.4.3.   Appendix "A" to this Agreement will completely and accurately describe all of your owners and their interests in you; and

  1.4.4.   Each of your owners, at any time during the term of this Agreement, will execute an agreement in the form that we prescribe (see Appendix "B" to this Agreement) undertaking to be bound jointly and severally by all provisions of this Agreement and any ancillary agreements between you and us that bind you. You and your owners agree to execute and deliver to us such revised Appendices "A" as may be necessary to reflect any changes in the information contained therein and to furnish such other information about your organization or information as we may request within five (5) days of change.

  1.4.5.   Your owners and you will grant to one individual, "Managing Owner," the authority to legally bind you in any dealings with us, or our affiliates, and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the BUSINESS. The Managing Owner, at all times during the term of the Agreement, shall maintain management control of the BUSINESS and shall own and control not less than fifty one (51%) percent of the

equity and voting power of all issued and outstanding capital stock of the BUSINESS, or shall have like authority, ownership, managerial control and voting power in any limited liability company or in any partnership, unless otherwise agreed upon in writing by us. You will notify us thirty (30) days in advance of any change in the identity of the Managing Owner. Where such change results from the death or incapacity of the Managing Owner, you shall immediately notify us of such death or incapacity and you will appoint a new Managing Owner within sixty (60) days after such death or incapacity and give us ten (10) days prior notice of such appointment. We reserve the right to review and disapprove of such appointed new Managing Owner. We reserve the right to review and approve the authority of such Managing Owner with respect to your Articles of Organization, LLC Operating Agreement, Partnership Agreement, Shareholders Agreement, or similar documents. Neither you nor your owners will, directly or indirectly, take any action to avoid or restrict the authority requirement for the Managing Owner.

**1.5.**    <u>**GRANT OF FRANCHISE**</u>.   You desire a franchise to own and operate a **1-800-WATER DAMAGE** business at a site to be approved by us in writing (the "Location"). Subject to the terms of, and upon the conditions contained in this Agreement, we hereby grant you a franchise (the "Franchise") to operate a **1-800-WATER DAMAGE** BUSINESS, and a license to use the Marks and the System in the operation thereof, for a term commencing on the date of this Agreement and expiring on the tenth (10th) anniversary, unless sooner terminated in accordance with Article 14 hereof.

**1.6.**    <u>**YOUR PERFORMANCE**</u>.   You (or your managing shareholder or partner) agree to personally manage and operate the BUSINESS as your primary occupation and will not, without our prior written consent, delegate your (or your managing shareholder's or partner's) authority and responsibility with respect to management and operation. You agree that you will at all times faithfully, honestly and diligently perform your obligations hereunder, continuously exert your best efforts to promote and enhance the BUSINESS and not engage in any other business or activity that conflicts with your obligations to operate the BUSINESS in compliance with this Agreement.

**1.7**    <u>**MARKETING AREA.**</u>

    1.7.1.   Subject to Articles 1.10. and 1.11., during the term of this Agreement and for as long as you meet your Sales Quota (as defined below) and are not otherwise in default under this Agreement, we shall not establish or license any other person to advertise, market or locate another **1-800-WATER DAMAGE** business within the geographical area set forth in Appendix "C" to the Franchise Agreement attached hereto ("Marketing Area").

    1.7.2.   You shall not advertise, market or solicit business outside your Marketing Area without our prior written consent. If, however, business leads that are generated within your Marketing Area result in services to be performed outside of your

Marketing Area, you are permitted to perform such services. Similarly, other 1-800-WATER DAMAGE franchisees are permitted to perform services in your Marketing Area, without compensation to you, if such services result from leads generated within the Marketing Area of the other franchisee(s).

1.7.3.  All disputes arising out of:  (i) your performance of services within another franchisee's Marketing Area; or (ii) another franchisee's performance of services within your Marketing Area, shall be submitted to us for resolution and our determination shall be final.  You acknowledge and agree that we have the right to require you to obtain our prior written consent to perform any services for locations outside of your Marketing Area in the future, whether or not you generated leads for such services in your Marketing Area.

**1.8.    TOLL FREE 1-800-WATER DAMAGE NUMBER.**  We have established a toll-free number, 1-800-WATER DAMAGE, to which customers may place calls for services offered by our franchisees.  Provided that you are in compliance with this Agreement, you will receive all telephone calls placed to the 1-800-WATER DAMAGE number by customers calling from within your Marketing Area.  Before you open for BUSINESS, you must pay us a deposit in the amount of $500, at which time we will give instructions to our telephone service provider to direct all calls placed by customers in your Marketing Area to you.

1.8.1.  As long as you meet your Sales Quota and are otherwise in compliance with the terms of this Agreement, we will not authorize anyone else to receive calls placed by customers in your Marketing Area.

1.8.2.  You are permitted to perform services for all calls placed by customers in your Marketing Area, regardless of whether such services are to be performed at locations outside of your Marketing Area.  Likewise, you acknowledge and agree that other system franchisees may provide services at locations within your Marketing Area if such work is generated as a result of toll-free calls placed by customers calling from the other franchisee's Marketing Area.

1.8.3.  If you fail to pay Royalties or other payments required under this Agreement when due, or if you fail to otherwise comply with the terms of this Agreement, we have the right to terminate or suspend your right to receive calls from the 1-800-WATER DAMAGE toll free number.  If your right to receive calls from the toll-free number is suspended or terminated, we have the right to re-direct all calls placed by customers in your Marketing Area to our offices, or to other system franchisees and we, or the authorized system franchisee, will be permitted to perform all services ordered from such calls, whether or not the services will be performed in your Marketing Area.

**1.9.    CONDUCTING BUSINESS OUTSIDE OF THE MARKETING AREA.**  Except as set forth in Articles 1.7 and 1.8 above, you shall not provide any services or sell any

products outside of the Marketing Area without obtaining our prior written consent. You shall not market, advertise, or solicit business outside of the Marketing Area.

**1.10**  **REFERRALS.** If you receive inquiries from prospective customers located outside your Marketing Area that are not a result of (i) calls placed from customers in your Marketing Area to the 1-800-WATER DAMAGE number; or (ii) marketing conducted within your Marketing Area, you must promptly advise us of such inquiries and provide us with copies of all such inquiries made in writing.  We shall forward such inquiries to the franchisee, if any, in whose Marketing Area such prospective customer is located.  If there is not such a franchisee, we may, at our discretion, allow you to service such inquiries.

**1.11.**  **NATIONAL OR REGIONAL ACCOUNTS.** We have the exclusive right to negotiate and enter into agreements or approve forms of agreement to provide services to any customer that owns, manages or controls 2 or more businesses or job sites whose presence is not confined within any one particular Marketing Area (a "National Account").  We may, at our option, require you to perform the services pursuant to the terms of the National Account contract.  You acknowledge and agree that if you are not in compliance with your obligations under this Agreement, if you refuse to perform the services, or if we choose not to require you to perform the services, we may provide the National Account services directly ourselves, or through another franchisee or third party even if the job site is in your Marketing Area without compensation to you.

**1.12.**  **NATURAL DISASTERS.** If there is a natural disaster (such as a hurricane, flooding or an earthquake), within your Marketing Area, we reserve the right to authorize other 1-800-WATER DAMAGE franchisees to perform services within your Marketing Area. We, in our absolute discretion, will determine:  (i) the number of franchisees permitted to perform services in your Marketing Area; (ii) the total number of jobs which may be serviced by other franchisees in your Marketing Area; and (iii) the time period during which such franchisees will be permitted to perform services within your Marketing Area.

**1.13.**  **RIGHTS WE RESERVE.** We (and our affiliates) retain the right in our sole discretion to:

1.13.1. establish and grant to franchisees the right to establish, 1-800-WATER DAMAGE businesses anywhere outside your Marketing Area on such terms and conditions as we deem appropriate;

1.13.2. distribute, or license others to distribute products identified by the Proprietary Marks or other marks we own or license through any alternative channel of distribution method we or our affiliates may periodically establish or license, including through the Internet;

1.13.3. offer services identified by the Proprietary Marks from locations within enclosed malls, airports, military bases and other closed markets within your Marketing Area;

1.13.4. establish other franchises, company-owned businesses or channels of distribution selling similar products or services under a different trademark in your Marketing Area; and

1.13.5. acquire, be acquired by, merge or affiliate with or engage in any transaction with other businesses (whether or not these businesses are competitive), including competing franchise systems with units operating in your Marketing Area.

2. **LOCATION SELECTION, LEASE OF LOCATION AND BUSINESS DEVELOPMENT.**

2.1. **LOCATION SELECTION.** You acknowledge that, following your execution of this Agreement, you (with or without our assistance) will find a Location for your BUSINESS, which selection is subject to our approval. You acknowledge and agree that our recommendation or approval of the Location, or any information regarding the Location communicated to you, does not constitute a representation or warranty of any kind, express or implied, as to the suitability of the Location for a **1-800-WATER DAMAGE** business or for any other purpose. Our recommendation or approval of the Location indicates only that we believe that the Location falls within the acceptable criteria for locations that we have established as of the time of our recommendation or approval of the Location. Application of criteria that have appeared effective with respect to other locations may not accurately reflect the potential for all locations, and after our approval of a location, demographic and/or other factors included in or excluded from our criteria could change, thereby altering the potential of a location. The uncertainty and instability of such criteria are beyond our control, and we are not responsible for the failure of a location we have recommended or approved to meet expectations as to potential revenue or operational criteria. You acknowledge and agree that your acceptance of the Location is based on your own independent investigation of the suitability of the Location.

2.2. **LEASE OF LOCATION.** You must obtain a lease or sublease for a Location subsequent to signing this Agreement, the form of which is subject to our approval prior to your signing it. After we approve and you sign the Lease, you are obligated to deliver a copy of the signed lease to us within fifteen (15) days at its execution. You acknowledge that our approval of the lease for the Location does not constitute a guarantee or warranty, express or implied, of the successful operation or profitability of a **1-800-WATER DAMAGE** business operated at the Location. Such approval indicates only that we believe that the Location and the terms of the lease fall within the acceptable criteria we have established as of the time of our approval. You further acknowledge that we have advised you to seek real estate counsel to review and evaluate the lease.

2.3.    **BUSINESS DEVELOPMENT.**    You are responsible for developing the BUSINESS. We will furnish you with mandatory specifications and layouts for a **1-800-WATER DAMAGE** business, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings and color scheme and other suggestions.    You are obligated to have prepared, at your expense, all required construction plans and specifications to suit the shape and dimensions of the Location and to ensure that such plans and specifications comply with applicable zoning and other ordinances, building codes and permit requirements and with lease requirements and restrictions.    You are obligated to submit construction plans and specifications to us for approval before construction of the BUSINESS is commenced and, at our request, to submit all revised or "as built" plans and specifications during the course of such construction.

2.4.    **REQUIRED PURCHASES.**

2.4.1.    We have the right to require you to purchase products, inventory, equipment, fixtures, furnishings, product display units, signs, uniforms, supplies, vehicles, and other materials from us or our designated or approved suppliers.    We will furnish you with a list of the equipment, motor vehicle requirements, and other required products, inventory and    accessories required in connection with the operation of the BUSINESS (collectively, the "Required Purchases").    You must purchase or lease such Required Purchases from us at our then current prices, or, at our direction, from sources or suppliers approved or designated by us (which sources or suppliers may include our affiliates).

2.4.2.    If you wish to purchase any item from an unapproved supplier, you must provide us with a written request for approval of the supplier.    Your request must include the name, address and telephone number of the proposed supplier, a description of the item you wish to purchase, and the purchase price of the item, if known.    We will approve or disapprove, in our sole discretion, your proposed supplier if we are satisfied that the proposed supplier meets our then-current standards and specifications.    The criteria we use for supplier approval is our confidential information. We are not obligated to and do not make this information available to our franchisees, proposed suppliers or others. At our request, you must provide us with a sample of the item you wish to purchase for testing.    If we incur any costs in connection with testing a particular product or evaluating an unapproved supplier at your request, you must reimburse our reasonable costs, regardless of whether we subsequently approve the supplier.    We will inform you of our decision regarding approval of a supplier within thirty days.    We may revoke our approval of particular products or suppliers if we determine, in our sole discretion, that products or suppliers no longer meet our standards for the System.    Upon receipt of written notice of such revocation, you must cease purchasing products from the supplier.

**2.5.** **YOUR OBLIGATIONS.** You agree, at your own expense, to do the following with respect to developing the BUSINESS:

    2.5.1. Secure all financing required to develop and operate the BUSINESS;

    2.5.2. Obtain all permits and licenses required to construct and operate the BUSINESS;

    2.5.3. Purchase or lease all Equipment required for the BUSINESS; and

    2.5.4. Purchase an initial inventory of authorized and approved ancillary goods, materials and supplies.

**2.6.** **BUSINESS COMMENCEMENT.** You agree not to commence operation of the BUSINESS until:

    2.6.1. Pre-commencement training has been completed to our satisfaction (see Article 4.1);

    2.6.2. The initial franchise fee and all other amounts then due to us have been paid; and

    2.6.3. We have been furnished with copies of all insurance polices required by this Agreement, or such other evidence of insurance coverage and payment of premiums as we have requested.

    2.6.4. We have been furnished with such evidence as we reasonably request that you possess the necessary equipment we require for you to operate the BUSINESS pursuant to our Methods of Operation (as defined in Article 4.5. below).

**2.7.** **COMMENCEMENT DEADLINE.** You agree to commence operating the BUSINESS within one hundred twenty (120) days after execution of this Agreement or within thirty (30) days after you have completed initial training to our satisfaction, as provided in Article 4.1. of this Agreement. If you are unable to commence operating the BUSINESS within the specified period due to circumstances beyond your reasonable control (other than lack of funds), then you shall be entitled to such additional time as may be reasonably required and as to which we consent to commence such operation.

**2.8.** **INITIAL LOCAL MARKETING.** You agree to conduct initial local marketing for the BUSINESS and to expend not less than $8,000 (the "Initial Local Marketing Expense") prior to commencing operation of the BUSINESS. Your Initial Local Marketing Expense must be used to purchase the marketing and public relations programs and media and advertising materials we have either developed or approved. Your initial local marketing shall be conducted at such times as we consider prudent. Any money you spend on printed yellow page phone book advertising shall not apply to the required Initial Local Marketing Expense.

3.    **FEES**.

3.1.    **INITIAL FRANCHISE FEE.**  You agree to pay us a nonrecurring and nonrefundable initial lump sum franchise fee in the amount of seventy four thousand three hundred twenty five dollars and twenty cents ($74,325.20).

The Initial Franchise Fee must be paid as follows:

| Payment | Amount | Due Date |
|---|---|---|
| First Payment | $74,325.20(100%) | Upon Execution of This Agreement |
| Remainder Payment (If Applicable) | $-0-(0%) | Upon your commencement of initial training OR within three business days of any disbursement of funds to you pursuant to any loan made to you or your principal officer in connection with the BUSINESS, whichever is earlier. |
| **TOTAL** | $74,325.20(100%) | -- |

The First Payment will be fully earned by us upon payment.  In no event are we obligated to refund the First Payment to you.

In the event that you make a First Payment in anticipation of obtaining a loan from a party other than us or any affiliate of ours, you must obtain funding within 60 days.  If you are ultimately unable to obtain financing, we will refund the First Payment (less our actual costs associated with your application and performing obligations under this Agreement), and this Agreement will terminate, if you provide us with satisfactory documentation that, despite diligently pursuing all reasonable avenues available and at all times acting in good faith, you are unable to obtain financing for the BUSINESS. We, in our sole discretion, will determine whether such documentation is satisfactory.  If you are unable to either obtain financing or provide satisfactory documentation of your inability to do so within 60 days of this Agreement, the First Payment will be fully earned by us.

3.2.    **ADDITIONAL MARKETING AREA AND FEE.**

If this is the second or subsequent 1-800-WATER DAMAGE™ Franchise Agreement that you have entered with us, and if your Marketing Area under this Agreement is 100,000 residential households and commercial businesses or buildings or fewer in size, and if you are in compliance with all of the terms of this Agreement, we may, in our sole discretion, permit you to increase the size of your Marketing Area (up to an appropriate total of 150,000 residential households and commercial businesses or buildings) by paying us a fee equal to forty cents (40¢) multiplied by the number of residential households and commercial businesses or buildings that you are Adding to your

Marketing Area. Any such increase must be made pursuant to a written Addendum signed by you and us, accompanied by the payment described in this paragraph.

**3.3.     ROYALTY.**

3.3.1   You agree to pay us, at our headquarters, a royalty ("Royalty") in the amount of ten (10%) percent of Gross Revenue (defined in Article 3.3) per calendar month (the "Accounting Period"). You will pay us the Royalty, and any other amounts due under this Agreement, by franchisor initiated electronic funds transfer (EFT), or by bank-wire transfer, or by check through United States mail, or by such other form of delivery as we authorize and approve. You must also send us a monthly revenue report, prepared per our requirements, and a copy of your most recent monthly bank statement for the BUSINESS, by the fifth (5th) day of each calendar month following the end of each preceding Accounting Period.

3.3.2   If you are a current franchisee and you increase your total Marketing Area, by purchasing Additional Marketing Area(s) or by entering into additional franchise agreements with us, or both, the Royalty under this Agreement will decrease by one-quarter percent (.25%) of Gross Revenue, for each additional 150,000 residential households and commercial businesses or buildings in the total Marketing Area(s) that you operate, as shown in the table below. The Royalty shall at no point decrease below 9% of Gross Revenue.

| Number of Households and Commercial Buildings | Royalty for Combined Marketing Area(s) |
|---|---|
| 0-299,999 | 10% |
| 300,000-449,999 | 9.75% |
| 450,000-599,999 | 9.50% |
| 600,000-749,999 | 9.25% |
| 750,000 + | 9% |

If you purchase an established Business, or "turn-key" operation, you will pay a royalty of 20% of Gross Revenue.

**3.4.     DEFINITION OF "GROSS REVENUE".** As used in this Agreement, the term "Gross Revenue" means all revenue you derive from operating the BUSINESS, whether from cash, check or credit transactions, but excluding all federal, state or municipal sales, use or service taxes collected from customers and paid to the appropriate taxing authority and excluding customer refunds, adjustments, credits and allowances actually made by the BUSINESS in compliance with our Methods of Operation (defined in Article 4.5).

**3.5.     INTEREST ON LATE PAYMENTS.** All amounts which you owe us and do not pay us when due will bear interest after their due date at the lesser of: (a) the highest contract

rate of interest permitted by law; or (b) eighteen (18%) percent per annum.   You acknowledge that this Article does not constitute our agreement to accept any payments after they are due or a commitment to extend credit to, or otherwise finance your operation of, the BUSINESS.   Your failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Article 14 hereof, notwithstanding the provisions of this Article.

3.6.   **APPLICATION OF PAYMENTS.**  Notwithstanding any designation you might make, we have sole discretion to apply any amounts collected from you to any of your past due indebtedness to us.   You acknowledge and agree that we have the right to set off any amounts you or your owners owe us against any amounts we might owe you or your owners.

3.7.   **SERVICE FEE.**   You agree that, if you fail to follow our "Methods of Operation" (defined in Article 4.5.) and such failure results in our having to perform, fully or partially, any service for your accounts, you will pay us the reasonable fees and expenses we (or our designees) incur to fulfill the service obligation for your account, which, at a minimum, shall be our then current per diem fee as set forth in our Operations Manual (see Article 4.5.).   Nothing set forth in this Article shall be construed as imposing, or assuming, any obligation to fulfill your service obligations.

3.8.   **PROCESSING FEE AND TOLL CHARGES.**   In consideration of our ongoing administrative support of your BUSINESS, you agree to pay us a processing fee (the "Processing Fee") in the amount of $50 Dollars, payable monthly on the fifth (5th) day of each calendar month, or at such other date as we may specify.   You must also reimburse us for the cost of the toll-free monthly fee and all usage charges, regulatory fees, taxes and any other charges associated with calls to the 1-800-WATER DAMAGE number placed from callers in your Marketing Area.

4.   **TRAINING AND COMMENCEMENT ASSISTANCE.**

4.1.   **TRAINING.**  Before the BUSINESS begins operating, we will furnish initial training on the operation of a **1-800-WATER DAMAGE** business to you (or, if you are a corporation or partnership, to your managing shareholder or partner) and up to three (3) additional employees you elect to enroll in the training program. Initial training consists of ten (10) working days of training for you (or your managing shareholder or partner) and your employees, to be furnished at our head office or at such other location as we may specify.   No other additional or refresher courses are required for you to commence operation of your franchise.   You (or your managing shareholder or partner) are required to complete the initial training to our satisfaction.   You also are required to participate in all other activities required to operate the **1-800-WATER DAMAGE** franchise. Although we will furnish initial training to you (or your managing shareholder or partner) and up to three (3) additional employees, you will be responsible for all travel and living expenses which you incur in connection with training. If we determine that you (or your managing shareholder or partner) are unable to complete initial training to our

satisfaction, by written and/or oral exam or otherwise, we have the right to terminate this Agreement pursuant to Article 14 hereof. If this is your second or subsequent 1-800-WATER DAMAGE Franchise Agreement, we may, in our discretion, eliminate the initial training requirement.

**4.2.** **REFRESHER TRAINING.** We may require you (or your managing shareholder or partner) and/or previously trained and experienced employees to attend periodic refresher training courses at such times and locations that we designate, and we may charge reasonable fees for such courses. We also may require you to pay us fees for our training your new employees hired after your BUSINESS commences operations, if you so request. You agree to give us reasonable assistance in training or assisting other **1-800-WATER DAMAGE** franchisees. We will reimburse you for your reasonable costs and expenses in providing such assistance.

**4.3.** **GENERAL GUIDANCE.** Subject to our availability and upon your reasonable request, we will advise you from time to time regarding operating issues concerning the BUSINESS. We may also offer you guidance on issues disclosed by reports you submit to us or on-site inspections we make. Such guidance will, at our discretion, be furnished in our "Operations Manual" (defined in Article 4.5. below), bulletins or other written materials and/or during telephone consultations and/or consultations at our office or the BUSINESS. In addition, subject to our availability and upon your reasonable request, we will furnish guidance to you with respect to:

4.3.1. Standards, specifications and operating procedures and methods utilized by the BUSINESS;

4.3.2. Purchasing of required ancillary goods, equipment, materials, supplies and services;

4.3.3. Advertising and marketing programs;

4.3.4. Employee training; and

4.3.5. Administrative, bookkeeping and accounting procedures and services.

**4.4.** **ADDITIONAL GUIDANCE.** During the term of this Agreement, we may, but are not obligated to, provide additional guidance in any of the following ways:

4.4.1. Subject to our availability and upon your reasonable request, telephone consultation during such times as are outlined in the Operations Manual (see Article 4.5. below);

4.4.2. Subject to our availability and upon your reasonable request, advice regarding purchasing, including providing you with list(s) of sources and approved suppliers for our ancillary goods, services, equipment, etc.;

4.4.3.  Ongoing marketing programs as we deem necessary in our sole discretion;

4.4.4.  Newsletter services where we may inform you periodically about the goings-on in the **1-800-WATER DAMAGE** franchise program;

4.4.5.  Meetings, seminars or conventions where we may get together with you and other **1-800-WATER DAMAGE** franchisees for business and/or social purposes;

4.4.6.  Research and development regarding Methods of Operation (see Article 4.5. below);

4.4.7.  At your request, we will furnish additional guidance and assistance and, in such a case, may charge the *per diem* fees and charges we establish from time to time. If you request, or if we require, additional or special training for your employees, all of the expenses that we incur in connection with such training, including *per diem* charges and travel and living expenses for our personnel, will be your responsibility.

4.4.8.  As we may mutually agree, we may provide ongoing assistance to you at the hourly fee we establish from time to time.

**4.5.**    **OPERATIONS MANUAL.**  During the term of this Agreement, we will loan to you one (1) copy of our operations manual ("Operations Manual"), consisting of such materials (which may include, among other things, audio tapes, videotapes, magnetic media, computer software, access to our intranet, and written materials) that we furnish to franchisees from time to time for use in operating a **1-800-WATER DAMAGE** business. The Operations Manual contains the System and other information and rules that we prescribe from time to time for the operation of a **1-800-WATER DAMAGE** business and information relating to your other obligations under this Agreement and related agreements, which, taken together, we refer to as methods of operation ("Methods of Operation"). We reserve the right to modify and supplement the Operations Manual from time to time to reflect changes in Methods of Operation, as we deem necessary in our sole discretion.  You agree to keep your copy of the Operations Manual current and confidential in a secure location at the BUSINESS.  In the event of a dispute relating to its contents, the master copy of the Operations Manual we maintain at our principal office will be controlling.  **YOU MAY NOT AT ANY TIME COPY, DUPLICATE, RECORD OR OTHERWISE REPRODUCE ANY PART OF THE OPERATIONS MANUAL.**  If we allow you to access the Operations Manual via the intranet, it shall be in "read only" format and may not be downloaded, saved, copied, duplicated, distributed or altered in any way.  If your copy of the Operations Manual is lost, destroyed or significantly damaged, you agree to obtain a replacement copy at our then applicable charge.

## 5.    MARKS.

**5.1.    <u>OWNERSHIP AND GOODWILL OF MARKS.</u>**  You acknowledge that the Marks are valid and are our sole property.  You will not, during the term of this Agreement or thereafter, do anything, or assist any other person to do anything that would infringe upon, harm or contest our rights in any way.  You further acknowledge that your right to use the Marks is derived solely from this Agreement and limited to your operation of the BUSINESS pursuant to and in compliance with this Agreement and Methods of Operation, which we prescribe from time to time during its term.  Your unauthorized use of the Marks constitutes a breach of this Agreement and an infringement of our rights in and to the Marks.  You acknowledge and agree that your usage of the Marks and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the BUSINESS in compliance with this Agreement).  All provisions of this Agreement applicable to the Marks apply to any additional proprietary trademarks and service marks and commercial symbols we authorize you to use.

**5.2.    <u>LIMITATIONS ON YOUR USE OF MARKS.</u>**  You agree to use the Marks as the sole identification of the BUSINESS, except that you agree to identify yourself as the independent owner thereof in the manner we prescribe.  You may not use any Marks as part of any corporate or legal business name or as part of an Internet domain name or Internet e-mail address or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you hereunder), or in any modified form, nor may you use any Marks in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing.  No Marks may be used in any advertising concerning the transfer, sale or other disposition of the BUSINESS or an ownership interest in you.  You agree to display the Marks prominently in the manner we prescribe at the BUSINESS, on supplies or materials we designate and in connection with forms and advertising and marketing materials.  You agree to give such notices of trademark and service marks registrations, i.e., "®," "™,"as we specify and to obtain any fictitious or assumed name registrations required under applicable law.  You agree to withdraw any fictitious or assumed name registrations immediately upon termination or expiration of this Franchise Agreement.

**5.3    <u>NOTIFICATION OF INFRINGEMENTS AND CLAIMS.</u>**  You agree to notify us immediately of any apparent infringement or challenge to your use of any Marks, or of any claim by any person of any rights in any Marks, and agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim.  We have sole discretion to take such action as we deem appropriate and the right to control exclusively any litigation, United States Patent and Trademark Office ("USPTO") proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Marks. You agree to sign any and all instruments and documents, render such assistance and do such acts and things as, in the opinion of our attorneys, may be necessary or

advisable to protect and maintain our interests in any litigation or USPTO proceeding or other proceeding or otherwise to protect and maintain our interests in the Marks.

**5.4**  **MODIFICATION / DISCONTINUANCE OF USE OF MARKS.**  If it becomes advisable at any time in our sole discretion for us and/or you to modify, substitute or discontinue the use of any Marks and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice thereof.  We will not be obligated to reimburse you for any loss of revenue attributed to any modified or discontinued Marks or for any expenditures you make to promote a modified or substitute trademark or service mark.


**6.**  **CONFIDENTIAL INFORMATION.**

**6.1.**  **DEFINITION OF CONFIDENTIAL INFORMATION.**  We possess (and will continue to develop and acquire), and may disclose to you, certain confidential information (the "Confidential Information") relating to the development and operation of **1-800-WATER DAMAGE** businesses, which may include (without limitation):

    6.1.1.  The System, the Operations Manual, any other proprietary materials, the sales and marketing techniques used, and knowledge of and experience in developing and operating **1-800-WATER DAMAGE** businesses;

    6.1.2.  Marketing and advertising programs for **1-800-WATER DAMAGE** businesses;

    6.1.3.  Knowledge of specifications for and suppliers of certain ancillary goods, services, equipment, materials and supplies; and

    6.1.4.  Knowledge of the operating results and financial performance of **1-800-WATER DAMAGE** businesses other than the BUSINESS.

**6.2.**  **FOR BUSINESS USE ONLY.**  You acknowledge and agree that you will not acquire any interest in Confidential Information, other than the right to utilize Confidential Information disclosed to you in operating the BUSINESS during the term of this Agreement, and that the use or duplication of any Confidential Information in any other business would constitute an unfair method of competition.  You further acknowledge and agree that Confidential Information is proprietary to us, includes our trade secrets and is disclosed to you solely on the condition that you agree, and you do hereby agree, that you:

    6.2.1  Will not use Confidential Information in any other business capacity;

    6.2.2.  Will maintain the absolute confidentiality of Confidential Information during and after the term of this Agreement;

6.2.3.  Will not make unauthorized copies of any portion of Confidential Information disclosed via electronic medium or in written or other tangible form; and

6.2.4.  Will adopt and implement all reasonable procedures that we prescribe from time to time to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restrictions on disclosure of Confidential Information to BUSINESS personnel and others.

**6.3.**   **IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS.**   All ideas, concepts, techniques or materials relating to a **1-800-WATER DAMAGE** business, whether or not constituting protectable intellectual property, and whether created by or on behalf of you or your owners, must be promptly disclosed to us, deemed to be our sole and exclusive property and part of the System and deemed to be works made for hire for us. You and your owners agree to sign whatever assignment or other documents we may request from time to time to evidence our ownership or to assist us in securing intellectual property rights in such ideas, concepts, techniques or materials.

## 7.   EXCLUSIVE RELATIONSHIP.

**7.1.**   **EXCLUSIVE DEALINGS.**   You acknowledge and agree that we would be unable to protect Confidential Information against unauthorized use or disclosure or to encourage a free exchange of ideas and information among **1-800-WATER DAMAGE** businesses if franchised owners of **1-800-WATER DAMAGE** businesses were permitted to hold interests in or perform services for a Competitive Business (defined below). You also acknowledge that we have granted the Franchise to you in consideration of and reliance upon your agreement to deal exclusively with us. You therefore agree that, during the term of this Agreement, neither you nor any of your principals or owners (nor any of your or your owners' spouses, children or other relatives by blood or marriage) will not directly or indirectly:

7.1.1.  Have any direct or indirect ownership interest in a Competitive Business;

7.1.2.  Perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business; or;

7.1.3.  Recruit or hire any person who is our employee or the employee of any **1-800-WATER DAMAGE** business without obtaining the prior written permission of that person's employer.

**7.2.**   **COMPETITIVE BUSINESS.**   The term "Competitive Business" as used in this Agreement means any business operating, or granting franchises or licenses to others to operate, any business which provides water damage restoration services and/or products or related services and/or products or which is similar to this BUSINESS (other than a **1-800-WATER DAMAGE** business operated under a franchise agreement with us).

**8.    METHODS OF OPERATION.**

8.1    **COMPLIANCE WITH METHODS OF OPERATION.** You acknowledge and agree that your operation and maintenance of the BUSINESS in accordance with Methods of Operation is essential to preserve the goodwill of the Marks and all **1-800-WATER DAMAGE** businesses. Therefore, at all times during the term of this Agreement, you agree to operate and maintain the BUSINESS in accordance with Methods of Operation, as we periodically modify and supplement them during the term of this Agreement. Methods of Operation may regulate any one or more of the following with respect to the BUSINESS:

8.1.1.  Replacement of obsolete or worn out equipment;

8.1.2.  Types, models and brands of required equipment, materials and supplies;

8.1.3.  Required or authorized services, ancillary goods and categories for same;

8.1.4.  Designated or approved suppliers (which may be limited to or include us) of ancillary goods, services, equipment, materials and supplies;

8.1.5.  Terms and conditions of the sale and delivery of, and terms and methods of payment for, ancillary goods, services, including direct labor, materials and supplies that you obtain from us, our affiliates or others;

8.1.6.  Sales, marketing, advertising and promotional programs and materials as well as media used in such programs;

8.1.7.  Use of the Marks;

8.1.8   Participation in market research and testing and services and ancillary goods development programs;

8.1.9.  Types, amounts, terms and conditions of insurance coverage required to be carried for the BUSINESS and standards for underwriters of policies providing required insurance coverage; our protection and rights under such policies as an additional named insured; required or impermissible insurance contract provisions; assignment of policy rights to us; periodic verification of insurance coverage that must be furnished to us; our right to obtain insurance coverage for the BUSINESS at your expense if you fail to obtain required coverage; our right to defend claims; and similar matters relating to insured and uninsured claims; and

8.1.10. Regulation of such other aspects of the operation and maintenance of the BUSINESS that we determine from time to time to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and **1-800-WATER DAMAGE** businesses.

**8.2.** **PROVISIONS OF THIS AGREEMENT.** You agree that Methods of Operation prescribed from time to time in the Operations Manual, or otherwise communicated to you in writing or other tangible form, constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include all Methods of Operation as periodically modified.

**8.3.** **MODIFICATION OF METHODS OF OPERATION.** We may periodically modify Methods of Operation, as we determine, and any such modifications may obligate you to invest additional capital in the BUSINESS ("Capital Additions") and/or incur higher operating costs; provided, however, that such modifications will not alter your fundamental status and rights under this Agreement. We will not obligate you to make any Capital Additions when such investment cannot, in our reasonable judgment, be amortized during the remaining term of this Agreement, unless we agree to extend the term of this Agreement so that such additional investment, in our reasonable judgment, may be amortized, or unless such investment is necessary in order to comply with applicable law.

**8.4.** **OPERATION OF THE SYSTEM.** In order to maintain the high quality and uniform standards, methods, procedures, techniques and specifications associated with the System and the Marks, and to promote and protect the goodwill associated therewith, you agree as follows (at your sole expense unless otherwise indicated):

8.4.1. To operate the BUSINESS continuously during the hours prescribed in the Operations Manual or otherwise as a **1-800-WATER DAMAGE** business according to the System and for no other purpose and not to carry on any business other than the BUSINESS at the Location;

8.4.2. To comply at all times with all federal, state, and municipal laws, regulations, by-laws, orders, rulings, ordinances and permits having application to the operation of the BUSINESS including, without limitation, all governmental regulations relating to worker's compensation, employment insurance, health, safety, sanitation, environmental hazardous products and withholding and payment of any goods and services tax and federal and state income taxes and sales taxes;

8.4.3. To obtain and to maintain in force all required licenses, permits, permissions, approvals and certificates relating to the operation of the BUSINESS within the Marketing Area;

8.4.4. To ensure that the BUSINESS is at all times under the direct, on-premises management and supervision of you (or, if you are a corporation or partnership, your managing shareholder or partner) or subject to Article 8.10 of this Agreement, a trained and qualified manager approved by us;

8.4.5. Subject to Article 8.10. hereof, to devote full time and attention to the BUSINESS in order to ensure the proper, efficient and effective operation thereof;

8.4.6. To continuously exert your best efforts to promote and enhance the BUSINESS and to participate (at your expense unless otherwise provided in this Agreement) in all promotional, advertising and marketing programs (including, without limitation, special discount or free coupon programs), campaigns and cooperatives developed by us;

8.4.7. To maintain at all times a suitable organization and a sufficient number of trained personnel (which shall not be less than the minimum requirements specified by us from time to time for the number of personnel and types of positions), to service all customers of the BUSINESS and to operate the BUSINESS efficiently. You must employ a sufficient number of personnel, as designated by us, who will be responsible for answering phones, dispatching jobs and collecting on claims and who shall oversee the marketing of your BUSINESS within the first year of operation;

8.4.8. To comply with all mandatory standards, methods, procedures, techniques and specifications from time to time prescribed by us in the Operations Manual or otherwise in writing relating to the operation of the BUSINESS;

8.4.9. To maintain all Equipment in good order and repair and to cause the same to be promptly replaced, in accordance with Article 8.5., as they become worn, damaged, obsolete, out of style or mechanically impaired;

8.4.10. At our request from time to time, to modernize, upgrade, refurbish and replace the Equipment to reflect the then current image and standards of **1-800-WATER DAMAGE** businesses;

8.4.11. At our request (which request shall be made no earlier than four (4) years after the execution of this Agreement) to redecorate or upgrade the motor vehicle used in connection with the BUSINESS to reflect the then current image and standards of **1-800-WATER DAMAGE** businesses;

8.4.12. If required by us, you (or, if you are a corporation or partnership, your managing shareholder or partner) and such of your managers and other personnel as we may reasonably require, shall attend and participate at any additional or supplemental training courses, conventions, conferences, seminars and franchisee meetings which may be conducted by or on behalf of us from time to time. We do not

intend to conduct more than two (2) such supplemental training courses or franchisee meetings during each year of the Term of this Agreement, but we have the right to hold more than two (2) such training courses or franchisee meetings when we, acting reasonably, consider such courses or meetings necessary. We shall have the right to charge you a reasonable fee for such courses or meetings and you shall also be responsible to pay all travel, accommodations, meal and other expenses of you and your managers and other personnel in respect of attending and completing such courses, conventions, conferences, seminars or meetings;

8.4.13. If required by us, to participate in such **1-800-WATER DAMAGE** franchisee advisory council as may be established or sponsored by us from time to time and to attend and participate at such meetings of such advisory council as may be required by us from time to time.

8.4.14. To maintain at all times arrangements with (and only with) credit card issuers or sponsors that we designate from time to time, to implement, maintain at all times and operate such credit verification systems, computerized point-of-sale systems, electronic funds transfer systems, automatic bank transfer systems, inventory control systems, record keeping and reporting systems and accounting and payroll systems, telephone answering services and all related computer hardware and software systems, as we may designate or approve from time to time;

8.4.15. If required by us, to purchase or lease, as the case may be, install and maintain at all times such computer systems, hardware and software necessary to permit us direct access by modem or other facility to your computerized point-of-sale systems and data and all other related computer hardware and software systems;

8.4.16. To promptly pay when due all taxes, expenses and surcharges of any kind levied or assessed by any and all governmental bodies or agencies, whether municipal, state, or federal, by reason of or in connection with your operation of the BUSINESS;

8.4.17. To use such accounting, record keeping and reporting systems as may be approved by us from time to time;

8.4.18. To use only those forms which are designated by us from time to time for use in the BUSINESS;

8.4.19. To carry on the BUSINESS and conduct yourself in a manner which does not reflect adversely upon you or the System or the Marks, or which might depreciate the goodwill associated with any of them; and

8.4.20. To wear and require all managers and employees to wear such uniforms or apparel at the Location as we may designate from time to time, such uniforms or apparel to be purchased by you from suppliers or sources designated by us.

**8.5.** **AUTHORIZED PRODUCTS AND SERVICES.** You must operate your BUSINESS in strict conformance with our methods, standards and specification as specified in our Operations Manual and various other confidential communications, which we may change at our discretion. To ensure uniformity and consistent quality in all **1-800-WATER DAMAGE** businesses, you may only offer approved products and services which meet our standards and specifications for sale in connection with your BUSINESS. You acknowledge that it is in your, our, and all other **1-800-WATER DAMAGE** franchisees' interest that the uniform standards, methods, procedures, techniques and specifications of the System be fully adhered to by you. Accordingly, you shall offer for sale only such services and products and use only such Equipment, signs, forms, motor vehicles and other items, as are from time to time authorized in writing by us, all of which must meet our standards and specifications. You also agree to purchase or lease (as directed by us) exclusively from us or from sources or suppliers approved or designated in writing by us (which sources or suppliers may include our Affiliates), all Equipment, signs, forms, products, motor vehicles and other items required by or used in the BUSINESS. You agree that we may realize a profit from your required purchases, including rebates, discounts or other allowances from designated or approved suppliers and we shall be entitled to retain such profit for our own use and credit without accounting to you. If you wish to purchase any item, including Equipment, from an unapproved source or suppliers, you must follow the procedures set forth in Article 2.4. of this Agreement.

**8.6.** **GROUP PURCHASING REBATES.** You shall have the right to participate, on the same basis as other **1-800-WATER DAMAGE** franchisees, in group purchasing programs for products, equipment, supplies and services which we may from time to time use, develop, sponsor or provide, including any programs arranged with sources or suppliers approved or designated by us pursuant to Article 8.5. hereof. We may, from time to time, receive rebates, discounts or other allowances in respect of such group purchasing programs which we shall be entitled to retain for our own use and credit without accounting to you.

**8.7.** **CAPITAL.** At all times during the Term of this Agreement, you shall maintain and employ in connection with the BUSINESS such minimum working capital as may be reasonably required by us from time to time to enable you to properly and fully carry out and perform all of your duties, obligations and responsibilities hereunder.

**8.8.** **INSURANCE.** You shall purchase, and at all times during the Term of the Agreement shall maintain in full force and effect, such policies of insurance in such amounts as are reasonably required by us from time to time or by law including, without limitation, business interruption, product liability, property, fire property damage, employee honesty and liability, and comprehensive general liability insurance, public liability and property

damage insurance evidenced by a standard automobile policy, and non-owned automobile insurance for and in respect of the BUSINESS. Currently, the minimum coverage amounts that you are required to obtain are as follows: (i) $1,000,000 general liability per occurrence; (ii) $2,000,000 aggregate limit; (iii) worker's compensation in the amount required by law; (iv) $1,000,000 product liability insurance; (v) 100% replacement value on leasehold improvements, inventory and electronic data processing; (vi) 1,000,000 vehicle liability for non-company owned automobiles; and (vii) business interruption insurance covering loss of income, extra expenses, crime and fraud. In all such policies of insurance, we shall be named as an insured party and such policies shall provide that we shall be sent duplicate copies of all documentation and correspondence from the insurer. You shall, at least fourteen (14) days prior to the opening of the BUSINESS, provide us with a certificate of coverage issued by the insurer indicating that all required insurance is in full force and effect and that it will not be terminated, permitted to lapse, expire or be changed without at least thirty (30) days' prior written notice to us. In the event that you do not maintain such insurance as required, we may obtain such insurance from an insurer selected by us and keep the same in full force and effect at your sole expense. Notwithstanding the foregoing, you shall, at our direction, participate in any group or blanket insurance program which we may establish from time to time for **1-800-WATER DAMAGE** businesses. You shall reimburse us for or, at our option, pay directly to the insurer, your share (as reasonably determined by us or insurer) of all premiums for such insurance. We shall not in any way be liable to you or any other person for any deficiency in such insurance.

8.9.   **GROUP INSURANCE**.  You shall participate in any group medical, dental or other health or benefit insurance program which may be established by us for **1-800-WATER DAMAGE** franchisees.

8.10.   **MANAGER.** You may from time to time appoint a manager or managers to assist in the management and operation of the BUSINESS. You shall not permit any such manager to assist in the management or operation of the BUSINESS until the manager has been approved by us and has successfully completed our initial training program and you have paid us our then current training fee and its reasonable costs of administering such program. Where any such manager is appointed, nothing herein shall be deemed to relieve you of your obligation to devote full time and attention to the BUSINESS and to maintain direct on-site supervision thereof. You shall not delegate the entire management of the BUSINESS without our prior written consent.

9.   **MARKETING.**

9.1   **BY US.** Recognizing the value of advertising and marketing to the goodwill and public image of **1-800-WATER DAMAGE** businesses, we may establish a regional and/or national advertising fund (the "Advertising Fund") for such advertising, marketing and public relations programs and materials as we deem necessary or appropriate in our sole discretion. Upon our written request, you agree to contribute to the Advertising Fund such amounts that we prescribe from time to time, not to exceed one (1%) percent of

Gross Revenue (the "Ad Fee"), payable monthly in the same manner as the Royalty due hereunder. We have the right to use Advertising Fund contributions, in our sole discretion, to develop, produce, and distribute national, regional and/or local advertising and to create advertising materials and public relations which promote, in our sole discretion, the services offered by System franchisees. These funds become our property to use in accordance with this Agreement upon payment to us, and are not held in trust for you or any other franchisee. We will direct all programs financed by the Advertising Fund, with sole discretion over the creative concepts materials and endorsements used therein and the geographic market and media placement and allocation thereof. We may require you to include a notation in any advertisement indicating "Franchises Available." You agree that the Advertising Fund may be used for any and all regional, multiregional, and/or national advertising programs that we deem appropriate. Pursuant to this paragraph, we may furnish you with samples of advertising, marketing formats, promotional formats and other materials at no additional cost to you, when and if we deem appropriate. Multiple copies of such materials will be furnished to you at our actual cost of producing them plus any related shipping handling and storage charges.

9.2 **ACCOUNTING.** The Advertising Fund will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the Advertising Fund and its programs including, without limitation, conducting market research, preparing advertising promotion and marketing materials, and collecting and accounting for contributions to the Advertising Fund. We may spend, on behalf of the Advertising Fund, in any fiscal year, an amount that is greater or less than the aggregate contribution of all **1-800-WATER DAMAGE** businesses to the Advertising Fund in that year and the Advertising Fund may borrow from us or others to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the Advertising Fund will be used to pay advertising costs before other assets of the Advertising Fund are expended. We will prepare an annual, unaudited, compiled statement of monies collected and costs incurred by the Advertising Fund and furnish the statement to you upon written request. We have the right to cause the Advertising Fund to be incorporated or operated through a separate entity at such time as we deem appropriate and such successor entity will have all of the rights and duties specified herein.

9.3 **PROPORTIONALITY.** You acknowledge that the Advertising Fund is intended to maximize recognition of the Marks and patronage of **1-800-WATER DAMAGE** businesses. Although we will endeavor to utilize the Advertising Fund to develop advertising and marketing materials and programs and to place advertising that will benefit all **1-800-WATER DAMAGE** businesses we undertake no obligation to ensure that expenditures by the Advertising Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Advertising Fund by **1-800-WATER DAMAGE** businesses operating in that geographic area. Nor are we under any obligation to ensure that any **1-800-WATER DAMAGE** business will benefit directly or in proportion to its Ad Fees paid to the Advertising Fund from the development of

advertising and marketing materials or the placement of advertising. Except as expressly provided in this Article, we assume no direct or indirect liability or obligation to you with respect to collecting amounts due to, or maintaining, directing or administering the Advertising Fund.

9.4     **DEFERRALS OR REDUCTIONS.**   We reserve the right to defer or reduce contributions of a **1-800-WATER DAMAGE** business franchisee and, upon thirty (30) days' prior written notice to you, to reduce or suspend your payment of Ad Fees to and suspend operations of the Advertising Fund for one or more periods of any length and to terminate (and if terminated to reinstate) the Advertising Fund. If the Advertising Fund is terminated, all unspent monies on the date of termination will be distributed to our franchisees in proportion to their respective contributions to the Advertising Fund during the preceding three (3) month period, and amounts required to be paid pursuant to Article 9.1. above shall be added to amounts required to be expended pursuant to Article 9.5. below.

9.5     **BY YOU.**   In addition to the Ad Fee you pay to the Advertising Fund and the Start-Up Marketing Expense, you agree to spend monthly for advertising and promotion of the BUSINESS not less than five (5%) percent of Gross Revenue.

9.6     **PROOF OF EXPENDITURE.**   We may review your books and records from time to time to determine your expenditures for such advertising and promotion. Proof of expenditures is nevertheless your burden during the term of this Agreement. If we determine that you have not spent the requisite amounts, we may require you to pay such unexpended amounts into the Advertising Fund. The costs of all your telephone directory advertising of the BUSINESS in the principal regular (white pages) and classified (yellow pages) telephone directories covering the area in which the BUSINESS is located will not be credited toward the advertising and promotion obligation described in this Article, unless such ad is a pre-approved display or in-column ad.

9.7     **TELEPHONE LISTINGS.**   You agree to prominently advertise the BUSINESS at your expense in the principal regular (white pages) and classified (yellow pages) sections of all local telephone directories using only those advertising materials as may be supplied by or designated by us in writing from time to time. The BUSINESS shall only be advertised in such directories under the Marks, and not under your name. If other **1-800-WATER DAMAGE** businesses are served by the same white pages or classified section, we may require group listings in such white pages or classified section, make direct arrangements with the telephone company and allocate such portion of the costs of such listings to you as we, in our reasonable discretion, consider appropriate. In all cases, you shall pay for all costs or bills associated with such listings. We may, from time to time, receive commissions or other amounts in connection with the placing of advertisements with the telephone company, which commissions or amounts we shall be entitled to retain to be used to defray our costs in making group listing arrangements. You acknowledge that we have the sole rights to all such numbers and listings and that a direction by us is conclusive evidence of such rights and listings and our authority to direct their transfers.

You agree to sign the Conditional Assignment of Telephone Numbers attached as Appendix "E."

**9.8**    **MEDIA APPEARANCES.**  You shall not make any television or radio appearance, or make any statement to any public media in connection with the BUSINESS, or the **1-800-WATER DAMAGE** business unless you obtain our prior written approval.

**9.9**    **SOLICITATION OF NEW FRANCHISEES.**  You acknowledge that we may from time to time develop advertising and promotional materials and displays regarding the solicitation of **1-800-WATER DAMAGE** franchisees.  You agree to display all such materials and displays at the Location or otherwise as required by us from time to time.

**9.10**    **CUSTOMER WARRANTIES.**  You shall participate in any System warranty programs which may be established by us from time to time, and to the extent not limited by applicable laws, shall provide to your customers such warranties regarding the products and services of the BUSINESS as we may reasonably require.

**9.11**    **NOTHING BUT THE TRUTH.**  You agree that any advertising, promotion and marketing you conduct will be completely clear and factual and not misleading and conform to the highest standards of ethical marketing and the promotion policies which we prescribe from time to time. Samples of all advertising, promotional and marketing materials which we have not prepared or previously approved must be submitted to us for approval before you use them.  If you do not receive written approval within thirty (30) days after our receipt of such materials, we will be deemed to have disapproved them. You may not use any advertising or promotional materials that we have disapproved. We own the copyrights to anything so submitted, whether approved by us or not.

## 10.    RECORDS, REPORTS AND FINANCIAL STATEMENTS.

**10.1.**    **BOOKKEEPING.**  You agree to establish and maintain at your own expense a bookkeeping, accounting and record keeping system conforming to the requirements and formats we prescribe from time to time.  We may require you to use approved computer hardware and software in order to maintain certain sales data and other information.  We may require you to use an accountant approved by us in advance by us.  You agree to furnish to us upon our request, on such forms that we prescribe from time to time, without limitation, as follows:

10.1.1. Within ten (10) days after their filing, copies of all signed sales tax returns and signed withholding tax returns for the BUSINESS and, as soon as you have received them, copies of the canceled checks for the required sales taxes and withholding taxes;

10.1.2. Within fifteen (15) days after the end of each calendar month, a profit and loss statement for the BUSINESS for the immediately preceding calendar month and a year-to-date balance sheet as of the end of such month;

10.1.3. Within ninety (90) days after the end of the BUSINESS' fiscal year, reviewed annual profit and loss and source and use of funds statements and a reviewed balance sheet for the BUSINESS as of the end of such fiscal year signed by you or your principal operating officer or operating partner; and

10.1.4. Within ten (10) days after our request, exact copies of federal and state income and other tax returns and such other forms, records, books and other information we may periodically require.

**10.2.** **VERIFICATION.**  You agree to verify and sign each report and financial statement in the manner we prescribe.  We have the right to disclose data derived from such reports without identifying you.  We also have the right to require you to have reviewed or audited financial statements prepared on an annual basis.  Moreover, we have the right, as often as we deem appropriate, including on a daily basis, to access the computer systems that you are required to maintain in connection with the operation of the BUSINESS and to retrieve all information relating to the BUSINESS' operations.

**11.** **INSPECTIONS AND AUDITS.**

**11.1.** **OUR RIGHTS TO INSPECT THE BUSINESS.**  To determine whether you and the BUSINESS are complying with this Agreement and the Methods of Operation, we and our designated agents have the right at any time during your regular business hours, and without prior notice to you, to:

11.1.1. Inspect your operation of the BUSINESS;

11.1.2. Observe, photograph and videotape the operations of the BUSINESS for such consecutive or intermittent periods, as we deem necessary;

11.1.3. Remove samples of any ancillary goods, materials or supplies for testing and analysis;

11.1.4. Interview personnel and customers of the BUSINESS; and

11.1.5. Inspect and copy any books, records (including electronic records) and documents relating to your operation of the BUSINESS.

**11.2.** **COOPERATION.**  You agree to cooperate with us fully in connection with any such inspections, observations, photographing, videotaping, product removal and interviews.  You agree to present to your customers such evaluation forms that we periodically

prescribe and to participate and/or request your customers to participate in any surveys performed by us or on our behalf.

**11.3.** **OUR RIGHT TO AUDIT.** We have the right at any time during regular business hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, your (if you are a corporation or partnership) and the BUSINESS's business, bookkeeping and accounting records, sales and income tax records and returns and other records. You agree to cooperate fully with our representatives and independent accountants we hire to conduct any such inspection or audit. In the event such inspection or audit is made necessary by your failure to furnish reports, supporting records or other information as herein required, or to furnish such items on a timely basis, you agree to reimburse us for the reasonable cost of such inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees. In the event an inspection or audit reveals that any payments have been understated in any report to us, then you shall immediately pay to us the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the highest contract rate of interest permitted by law. If an inspection or audit discloses an understatement in any report of two (2%) percent or more, you shall, in addition to repayment of monies owed with interest, reimburse us for any and all costs and expenses connected with the inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees. The foregoing remedies are in addition to our other remedies and rights under this Agreement and applicable law.

**12.** **TRANSFER.**

**12.1.** **BY US.** This Agreement is fully transferable by us and will inure to the benefit of any transferee or other legal successor to our interests herein.

**12.2.** **BY YOU.** You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a corporation or partnership, to your owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability, acumen and financial capacity. Accordingly, neither this Agreement (or any interest therein) nor any ownership or other interest in you or the BUSINESS may be transferred, sold or assigned without our prior written approval. Any transfer without such approval constitutes a breach of the Agreement and is void and of no effect. A sale, transfer or assignment (collectively, "Transfer") requiring our prior written approval shall include:

12.2.1. your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in this Agreement, you or the BUSINESS;

12.2.2. if you are a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of any of your shares or any increase in the number of outstanding shares;

12.2.3. if you are a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest;

12.2.4. if you are a limited liability company, upon the assignment, sale, pledge or transfer of any interest in the limited liability company;

12.2.5. transfer of an interest in you, this Agreement or the BUSINESS in a divorce, insolvency or corporate or partnership dissolution proceeding or otherwise by operation of law;

12.2.6. transfer of an interest in you, this Agreement or the BUSINESS, in the event of your death or the death of one of your owners, by will, declaration of or transfer in trust or under the laws of intestate succession; or

12.2.7. pledge of this Agreement (to someone other than us) or of an ownership interest in you as security, foreclosure upon the BUSINESS or your transfer, surrender or loss of possession, control or management of the BUSINESS.

**12.3**   **CONDITIONS FOR APPROVAL OF TRANSFER.**   We shall have the right to consent to a transfer of the BUSINESS upon the satisfaction of the following conditions:

12.3.1. You are in compliance with all of your obligations under this Agreement and any other Agreement between you and us;

12.3.2. The transferee has the moral character, skill, aptitude, attitude, experience, references, acumen and financial capacity to operate the BUSINESS as determined by us in our sole discretion;

12.3.3. You have paid all amounts owed to our affiliates and system suppliers;

12.3.4. the transferee has met all of our then-current qualifications and standards for new franchisees;

12.3.5. the transferee (or its managing shareholder, member or partner) has successfully completed all training programs to our satisfaction;

12.3.6. the transferee upgrades the BUSINESS to conform to our then current specifications and design;

12.3.7. the transferee signs our then-current form of franchise agreement and all other ancillary agreements, including a personal guarantee;

12.3.8. you pay us a transfer fee in an amount equal to seven cents ($.07) multiplied by the number of residential households and commercial businesses or buildings in your total Marketing Area.  You shall also pay us all of our reasonable costs we incur in connection with the transfer, including the costs of training the transferee (or its managing shareholder or partner) and its other personnel, reasonable legal fees and administrative costs incurred, and our reasonable out-of-pocket expenses, including, without limitation, travel, meals, lodging and other investigative expenses involved in meeting with or qualifying the transferee.  If the proposed transfer is among your owners, Article 12.4.5. shall not apply, although you are required to reimburse us for any reasonable legal and administrative costs we incur in connection with the transfer;

12.3.9. you (and your transferring owners) have executed a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents.  Notwithstanding such release, you shall remain obligated under the provisions of this Agreement that extend beyond the term of this Agreement, including all Confidentiality, non-competition and indemnification provisions;

12.3.10. we have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the BUSINESS (but make no representation of any kind whatsoever to anyone that such is the case);

12.3.11. If you, or your owners, finance any part of the sale price of the transferred interest, you and/or your owners have agreed that all of the transferees' obligations pursuant to any promissory notes, agreements or security interest that your or your owners have reserved in the BUSINESS are subordinate to the transferee's obligation to pay Royalties and other amounts due to us and otherwise to comply with this Agreement; and

12.3.12. if the transferee is a corporation or limited liability company, the corporation or limited liability company's satisfaction of our requirements for such entities as set forth in Article 12.4 below.  In addition, all shareholders of a corporation transferee and all members and managers of a limited liability company transferee must be approved by us.

**12.4.** **TRANSFER TO A CORPORATION OR LIMITED LIABILITY COMPANY WHOLLY OWNED BY YOU.** Notwithstanding Article 12.3., if you are in full compliance with this Agreement, you may transfer this Agreement to a corporation or limited liability company subject to the terms of this Article 12.4.  Such Transfer shall not be subject to the conditions set forth in Article 12.3 above, provided that the corporation or limited liability company complies with the following requirements;

12.4.1. The corporation or limited liability company must be newly organized and its activities confined to acting exclusively as a 1-800-WATER DAMAGE franchisee;

12.4.2. you are, and at all times remain, the owner of (i) 51% of the outstanding shares of the corporation; or (ii) a controlling interest in the limited liability company;

12.4.3. the corporation or limited liability company agrees in writing to assume all of your obligations hereunder;

12.4.4. all shareholders of the corporation, or all members of the limited liability company, must sign our guarantee agreement, personally agreeing to be bound by the terms of this Agreement and guaranteeing the performance of all franchisee's obligations under this Agreement;

12.4.5. each stock or interest certificate must be conspicuously endorsed upon its face with a statement in a form satisfactory to us that it is held subject to the restrictions imposed upon assignment by this Agreement;

12.4.6. the corporation or limited liability company must sign an assignment and assumption agreement agreeing to be bound by all provisions of this Agreement.

**12.5.  TRANSFER UPON YOUR DEATH OR DISABILITY.**  Upon your death or permanent disability or, if you are a corporation or partnership, the death or permanent disability of the owner of a controlling interest in you, your or such owner's executor, administrator, conservator, guardian or other personal representative must transfer your interest in this Agreement or such owner's interest in you to a third party.  Such disposition of this Agreement or the interest in you (including, without limitation, transfer by bequest or inheritance) must be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability, and will be subject to all of the terms and conditions applicable to transfers contained in this Article.  A failure to transfer your interest in this Agreement or the ownership interest in you within this period of time constitutes a breach of this Agreement.  For purposes hereof, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an owner of a controlling interest in you from managing and operating the BUSINESS for a period of three (3) months from the onset of such disability, impairment or condition.

**12.6.  OPERATION UPON YOUR DEATH OR DISABILITY.**  If, upon your death or permanent disability or the death or permanent disability of the owner of a controlling interest in you, the BUSINESS is not being managed by a trained manager, your or such owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or permanent disability, appoint a manager to operate the BUSINESS.  Such manager will be required to complete training at your expense within sixty (60) days of being

appointed to operate the BUSINESS. Pending the appointment of a manager as provided above or if, in our judgment, the BUSINESS is not being managed properly any time after your death or permanent disability or after the death or permanent disability of the owner of a controlling interest in you, we have the right, but not the obligation, to appoint a manager for the BUSINESS. All funds from the operation of the BUSINESS during the management by our appointed manager will be kept in a separate account, and all expenses of the BUSINESS, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We also have the right to charge a reasonable management fee (in addition to the Royalty contributions payable under this Agreement) during the period that our appointed manager manages the BUSINESS. Operation of the BUSINESS during any such period will be on your behalf, provided that we only have a duty to utilize reasonable efforts in doing so and will not be liable to you or your owners for any debts, losses or obligations incurred by the BUSINESS or to any of your creditors for any products, materials, supplies or services the BUSINESS purchases during any period it is managed by our appointed manager.

12.7. **EFFECT OF CONSENT TO TRANSFER.** Our consent to a transfer of this Agreement and the BUSINESS or any interest in you does not constitute a representation as to the fairness of the terms of any contract between you and the transferee, a guarantee of the prospects of success of the BUSINESS or transferee or a waiver of any claims we may have against you (or your owners) or of our right to demand the transferee's exact compliance with any of the terms or conditions of this Agreement.

12.8. ***BONA FIDE* OFFERS.** If you (or any of your owners) at any time determine to sell, assign or transfer for consideration an interest in this Agreement and the BUSINESS or an ownership interest in you, you (or such owner) agree to obtain a *bona fide*, executed written offer and earnest money deposit (in the amount of five (5%) percent or more of the offering price) from a responsible and fully disclosed offeror (including lists of the owners of record and beneficially of any corporate offeror and all general and limited partners of any partnership offeror and, in the case of a publicly held corporation or limited partnership, copies of the most current annual and quarterly reports and Form 10(K) and immediately submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, *bona fide* offer, the proposed purchase price must be denominated in a dollar amount. The offer must apply only to an interest in you or in this Agreement and the BUSINESS and may not include an offer to purchase any of your (or your owners') other property or rights. However, if the offeror proposes to buy any other property or rights from you (or your owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of purchase offered to you (or your owners) for the interest in you or in this Agreement and the BUSINESS must reflect the *bona fide* price offered therefor and not reflect any value for any other property rights.

12.9 **OUR RIGHT OF FIRST REFUSAL.** We have the right, exercisable by written notice delivered to you or your selling owners within sixty (60) days from the date of the

delivery to us of both an exact copy of such *bona fide* offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such *bona fide* offer, provided that:

12.9.1.   We may substitute cash for any form of payment proposed in such offer;

12.9.2.   Our credit will be deemed equal to the credit of any proposed purchaser;

12.9.3.   We will have not less than sixty (60) days after giving notice of our election to purchase to prepare for closing; and

12.9.4.   We are entitled to receive, and you and your owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to:

        12.9.4.1.   Ownership and condition of and title to stock or other forms of ownership interest and/or assets;

        12.9.4.2.   Liens and encumbrances relating to the stock or other ownership interest and/or assets; and

        12.9.4.3.   Validity of contracts and the liabilities, contingent or otherwise, of the corporation whose stock is being purchased.

**12.10.  EXERCISE.** If we exercise our right of first refusal, you and your selling owner(s) agree that you and they will be bound by all post-term obligations as set forth in Article 15 of this Agreement, including the non-competition covenant contained in Article 15.4. and the restrictions of Article 12.3.10. of this Agreement.

**12.11.  NON-EXERCISE.** If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact terms of such *bona fide* offer, subject to our approval of the transfer as provided in Articles 12.2., 12.3., and 12.4. provided that, if the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such *bona fide* offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the thirty (30) day period following either the expiration of such one hundred twenty (120) day period or notice to us of the material changes) in the terms of the sale, either on the terms originally offered or the modified terms, at our option.

**13.   EXPIRATION OF THIS AGREEMENT.**

**13.1.** **ACQUISITION OF A SUCCESSOR FRANCHISE.** Upon expiration of the term of this Agreement, if you (and each of your owners): (i) have satisfied all monetary obligations owed to us, our affiliates, suppliers and third party creditors; (ii) are in compliance with the terms of this Agreement and all other agreements between you and us; and (iii) have substantially complied with this Agreement during its term, subject to the terms and conditions set forth in this Article 13, you will have the right to acquire a successor franchise to operate the BUSINESS as a **1-800-WATER DAMAGE** business on the terms and conditions of the franchise agreement we are then using in granting successor franchises for **1-800-WATER DAMAGE** businesses, provided you add or replace equipment and otherwise modify the BUSINESS as we require to bring it into compliance with specifications and standards then applicable for **1-800-WATER DAMAGE** businesses. You must also pay us a successor franchise fee in the amount of $10,000 Dollars.

**13.2.** **GRANT OF A SUCCESSOR FRANCHISE.** You agree to give us written notice of your election to acquire a successor franchise at least six (6) months and not more than twelve (12) months prior to the expiration of the then current term of the Agreement. We agree to give you written notice ("Our Notice"), not more than ninety (90) days after we receive your notice, of our decision, in accordance with Article 13.1:

13.2.1. To grant you a ten (10) year successor franchise;

13.2.2. To grant you a successor franchise on the condition that deficiencies of the BUSINESS or in your operation of the BUSINESS, are corrected; or

13.2.3. Not to grant you a successor franchise based on our determination that you and your owners have not substantially complied with this Agreement during its term.

**13.3.** **OUR NOTICE.** If applicable, Our Notice will:

13.3.1. Describe the improvements or modifications required to bring the BUSINESS into compliance with then applicable specifications and standards for **1-800-WATER DAMAGE** businesses; and

13.3.2. State the actions you must take to correct operating deficiencies and the time period in which such deficiencies must be corrected.

**13.4.** **NO GRANT.** If we elect not to grant a successor franchise, Our Notice will describe the reasons for our decision. Your right to acquire a successor franchise is subject to your continued compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to your compliance with the obligations described in Our Notice.

**13.5.** **90 DAY CURE.** If Our Notice states that you must cure certain deficiencies of the BUSINESS or its operation as a condition to the grant of a successor franchise, we will give you written notice of a decision not to grant a successor franchise, based upon your failure to cure such deficiencies, not less than ninety (90) days prior to the expiration of this Agreement, provided, however, that we will not be required to give you such notice if we decide not to grant you a successor franchise due to your breach of this Agreement during the one hundred eighty (180) day period prior to its expiration. If we fail to give you:

   13.5.1.  Notice of deficiencies in the BUSINESS, or in your operation of the BUSINESS, within one hundred eighty (180) days after we receive your timely election to acquire a successor franchise; or

   13.5.2.  Notice of our decision not to grant a successor franchise at least ninety (90) days prior to the expiration of this Agreement, if such notice is required, we may extend the term of this Agreement for such period of time as is necessary in order to provide you with either reasonable time to correct deficiencies or the ninety (90) day notice of our refusal to grant a successor franchise required hereunder.

**13.6.** **AGREEMENTS/RELEASES.** If you satisfy all of the other conditions to the grant of a successor franchise, you and your owners agree to execute the form of franchise agreement and any ancillary agreements we are then customarily using in connection with the grant of successor franchises for **1-800-WATER DAMAGE** businesses. You acknowledge and agree that the terms of this agreement may vary materially from the terms of this Agreement and may include, without limitation, higher royalty and advertising fees. You and your owners further agree to execute general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns, including all claims arising out of this Agreement, relating in any way to the BUSINESS or arising out of any other agreement with us and/or our affiliates. Failure by you or your owners to sign such agreements and releases and deliver them to us for acceptance and execution one hundred eighty (180) days after their delivery to you will be deemed an election not to acquire a successor franchise.

## 14.   TERMINATION OF AGREEMENT.

**14.1.** **BY YOU.** You and your owners may not terminate this Agreement except by operation of law. Your termination of this Agreement for any other reason or without availing yourself of legal redress will be deemed a termination without cause.

**14.2.** **BY US.** We have the right to terminate this Agreement, which termination shall become effective upon delivery of written notice of termination to you, without providing you an opportunity to cure, if:

14.2.1. You (or your managing shareholder, member or partner) fail to successfully complete initial training to our satisfaction, in which case, we will refund the initial franchise fee set forth in Article 3.1. above, less our reasonable administrative, supervisory, accounting, training and legal costs but without interest or further deduction, and your acceptance of such sum releases us from any liability or obligation to you of any nature or kind including, without limitation, any liability for incidental or consequential damages or damages for loss of opportunity or loss of profits;

14.2.2. You fail to begin operating the BUSINESS within one hundred twenty (120) calendar days after execution of the Agreement or within thirty (30) calendar days after the completion of your initial training;

14.2.3 You abandon or fail actively to operate the BUSINESS, for five (5) or more consecutive business days, unless the BUSINESS has been closed for a purpose we have approved or because of a major and significant casualty or by reason of a lawful government order;

14.2.4. You Transfer the BUSINESS without our prior written consent;

14.2.5 You (or any of your owners) have made any material misrepresentation or omission in connection with your purchase of the Franchise;

14.2.6. You (or any of your owners) are or have been convicted by a trial court of, or plead or have pleaded no contest to, a felony or any crime involving moral turpitude;

14.2.7. You (or any of your owners) engage in any dishonest or unethical conduct which may adversely affect the reputation of the BUSINESS or another **1-800-WATER DAMAGE** business or the goodwill associated with the Marks;

14.2.8. You (or any of your owners) make an unauthorized assignment of this Agreement or of an ownership interest in you or the BUSINESS;

14.2.9. In the event of your death or permanent disability or the death or permanent disability of the owner of a controlling interest in you, this Agreement or such owner's interest in you is not assigned as herein required;

14.2.10. You (or any of your owners) make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

14.2.11. You violate any health, safety or sanitation law, ordinance or regulation and do not immediately begin to cure the non-compliance or violation, and correct such

non-compliance or violation within twenty four (24) hours after written notice thereof is delivered to you;

14.2.12. You fail to make payments of any amounts due to us and do not correct such failure within seven (7) days after written notice of such failure is delivered to you;

14.2.13. You fail to pay when due any federal or state income, service, sales, employment related or other taxes due on the operations of the BUSINESS, unless you are, in good faith, legally contesting your liability for such taxes;

14.2.14. You (or any of your owners) fail to comply with any other provision of this Agreement or Methods of Operation and do not correct such failure within thirty (30) days after written notice of such failure to comply is delivered to you;

14.2.15. You (or any of your owners) fail on three (3) or more separate occasions within any period of twelve (12) consecutive months to submit when due reports or other data, information or supporting records, or to pay when due any amounts due to us or otherwise to comply with this Agreement, whether or not such failures to comply were corrected after written notice of such failure was delivered to you; or

14.2.16. You make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee or liquidator of all or the substantial part of your property; the BUSINESS or any of its assets is attached, seized, subjected to a writ or distress warrant or levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within thirty (30) days; or order appointing a receiver, trustee or liquidator of you or the BUSINESS is vacated within thirty (30) days following the entry of such order.

14.2.17. You fail to attain or exceed the minimum Gross Revenue requirements identified in Article 14.3. below.

## 14.3. **SALES QUOTA.**

14.3.1. You must derive a minimum Gross Revenue in an amount equal to: (i) .80¢ per residential and commercial building located in your Marketing Area for your first year of operation as measured from the date you open for business; and (ii) $1.60 per residential and commercial business or building located in your Marketing Area for your second and each subsequent year of operation (collectively, the "Sales Quota"). We disclaim and you acknowledge that the Sales Quota is not intended, nor shall it be construed as, a statement of earnings.

14.3.2. Upon your first failure to attain the applicable Sales Quota, you may cure such failure by paying to us, within 60 days, the Royalty Fee and Advertising Fund contribution and by making the local advertising expenditure required under this Agreement, in amounts equal to the difference between the amounts you would have paid or spent had you met the applicable Sales Quota for that period, and the amounts you actually paid or spent.

14.3.3. We may, at our sole discretion, require you to meet with us, at such location as we may specify, for the purpose of you reviewing the operation of the BUSINESS with us, and/or attend, together with such of your employees as we may designate, a refresher course conducted by or for us at the location we specify. You will pay our administrative costs for such review and refresher course and will bear all our and our employees' transportation and accommodation costs in connection with such review and refresher course.

14.3.4. If you fail to pay any amounts required in order to cure a failure to meet the applicable Sales Quota; or attend together with such employees as we designate at a review or a refresher course we require; or meet the applicable Sales Quota on two occasions, then you may be deemed to be in default under the franchise agreement and we may, at our option, effective immediately upon notice to you but without prior opportunity to cure the default, terminate the franchise agreement and all rights granted in the franchise agreement or render all or any portion of the Marketing Area as non-exclusive.

## 15.   OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.

**15.1.   PAYMENT OF AMOUNTS OWED TO US AND ASSIGNMENT OF CUSTOMER ACCOUNTS.** You agree to pay us within fifteen (15) days after the effective date of termination, for any reason, or expiration of this Agreement, or on such later date that the amounts due to us are determined, all Royalties, Ad Fees, amounts owed for purchases from us, interest due on any of the foregoing and all other amounts owed to us which are then unpaid. You agree to assign all of your customer accounts to us or to our designee within fifteen (15) days after the effective date of termination or expiration of this Agreement.

**15.2.   MARKS.** Upon the termination, for any reason, or expiration of this Agreement:

15.2.1. You must immediately cease using the Marks and all Confidential Information and you may not directly or indirectly at any time or in any manner (except with respect to other **1-800-WATER DAMAGE** businesses you own and operate) identify yourself or any business as a current or former **1-800-WATER DAMAGE** business, or as one of our licensees or franchisees; nor use any Marks, any colorable imitation thereof or other indicia of a **1-800-WATER DAMAGE** business in any manner or for any purpose or utilize for any purpose

any trade name, trademark or service mark or other commercial symbol that indicates or suggests a connection or association with us;

15.2.2. You must immediately take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Marks;

15.2.3. Immediately return to us: (i) the Operations Manual; (ii) all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging and other materials containing any Marks or otherwise identifying or relating to a **1-800-WATER DAMAGE** business; (iii) all computer files, customer data and programs; and (iii) all other information which relates to the System or the operation of the BUSINESS. You shall allow us, without liability to you or third parties, to remove all such items from the BUSINESS;

15.2.4. You shall promptly and at your own expense make such alterations as we may specify to distinguish the BUSINESS clearly from its former appearance and from other **1-800-WATER DAMAGE** businesses so as to prevent confusion therewith by the public;

15.2.5. You shall promptly: (i) cancel or transfer to us our out designee any and all telephone listings; (ii) notify any Internet service companies of the transfer of any Internet address you may be using to us, and you will notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, telecopy or other numbers and any regular, classified or other telephone directory listings associated with any Marks; and (iii) authorize the transfer of such numbers and directory listings to us or at our direction and/or instruct the telephone company to forward all calls made to your telephone numbers to numbers we specify;

15.2.6. You agree to furnish us, within thirty (15) days after the termination or expiration of this Agreement, with evidence satisfactory to us of your compliance with the foregoing obligations; and

15.2.7. You shall comply with all provisions of this Agreement that, by their nature, survive the termination or expiration of this Agreement, including, without limitation, all Confidentiality, non-competition and indemnification obligations.

**15.3.** **CONFIDENTIAL INFORMATION.** You agree that, upon termination or expiration of this Agreement, you will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Operations Manual and any other confidential materials, including, without limitation, computer software and any mechanisms (electronic key) used to access the software, that we have allowed you to use.

**15.4.** **COVENANT NOT TO COMPETE.** Upon termination for any reason, expiration or transfer of this Agreement, you and your owners agree that, for a period of thirty six (36) months (the "Restriction Period") commencing on the effective date of termination, transfer or expiration, neither you nor any of your owners shall not, within a 75 mile radius of your Marketing Area or any other 1-800-WATER DAMAGE franchisee's Marketing Area in existence as of the date of such termination, expiration or transfer:

      15.4.1. have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business, as defined in this Agreement;

      15.4.2. Perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business; or

      15.4.3. Recruit or hire any person who is our employee or the employee of any **1-800-WATER DAMAGE** business without obtaining the prior written permission of that person's employer.

**15.5.** **COMMENCEMENT BY ORDER.** If any person restricted by this Article refuses voluntarily to comply with the foregoing obligations, the Restriction Period will commence with the entry of an order of an arbitrator, or court if necessary, enforcing this provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the covenants made in this Article will not deprive you of your personal goodwill or ability to earn a living.

**15.6.** **OUR RIGHT TO PURCHASE BUSINESS PROPERTY.**

      15.6.1. *Exercise of Option.* Upon our termination of this Agreement in accordance with its terms and conditions or your termination of this Agreement without cause, we have the option, exercisable by giving written notice thereof to you within sixty (60) days from the date of such termination or expiration, to purchase all property used in connection with the operation of the BUSINESS from you. (The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "Notification Date.") We have the unrestricted right to assign this option to purchase the BUSINESS. We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise.

      15.6.2. *Purchase Price.* The purchase price for the BUSINESS property shall be the "book value" for such property. For purposes of this Article, "book value" means the amount you actually paid for the property less depreciation (calculated by using the straight-line depreciation method on a 10 year depreciation schedule

irrespective of the depreciation method or schedule you use for accounting purposes). Notwithstanding the foregoing, to the extent that we exercise our right to purchase any BUSINESS property that is subject to a lease or finance agreement, the purchase price of such property shall equal the amount of your remaining obligations under the lease or finance agreement, as applicable. We shall be entitled to offset the purchase price by the amount of money owed by you to us for any payments necessary to acquire clear title to property or for any other debt. If we exercise our option to purchase, pending the closing of such purchase, we have the right to appoint a manager to maintain operation of the BUSINESS, or we may require that you close the BUSINESS during such period without removing any assets. You are required to maintain in force all insurance policies required under this Agreement until the date of such closing. We have the unrestricted right to assign this option to purchase the BUSINESS. We will be entitled to all customary warranties and representations in connection with our purchase of your property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

15.6.3. *Exclusions.* We may exclude from the BUSINESS property purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the BUSINESS's operation or that we have not approved as meeting standards for 1-800-WATER DAMAGE businesses.

15.6.4. *Instruments.* At the closing, you agree to deliver instruments transferring:

    15.6.4.1.    Good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you; and

    15.6.4.2.    All licenses and permits of the BUSINESS which may be assigned or transferred; and

15.6.5. *Escrow.* If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will be accomplished through an escrow.

15.6.6. *Releases.* You and your owners agree to execute general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns. You agree to indemnify, exculpate, defend and hold us, our affiliates and our respective shareholders, directors, officers, employees, agents, successors and assignees (the "Indemnified Parties") harmless from and against and to reimburse any one or more of the

Indemnified Parties for all claims, obligations, liabilities, costs, and damages, any and all taxes described in Article 16.3. and any and all claims and liabilities directly or indirectly arising out of the BUSINESS' operation or your breach of this Agreement.

15.7. **CONTINUING OBLIGATIONS.**    All of our and your (and your owners' and affiliates') obligations which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

16. **RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION.**

16.1. **INDEPENDENT CONTRACTORS.**    You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us, that we and you are and will be independent contractors and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner or employee of the other for any purpose.  You agree to conspicuously identify yourself in all dealing with customers, suppliers, public officials, BUSINESS personnel and others as the owner of the BUSINESS under a franchise we have granted and to place such notices of independent ownership on such forms, checks, business cards, stationery and advertising and other materials as we may require from time to time.

16.2. **NO LIABILITY FOR ACTS OF OTHER PARTY.**  You agree not to employ any of the Marks in signing any contract or applying for any license or permit, or in a manner that may result in our liability for any of your indebtedness or obligations, and that you will not use the Marks in any way we have not expressly authorized.  Neither we nor you will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of the other, represent that our respective relationship is other than franchisor and franchisee or be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing.   We will not be obligated for any damages of any nature whatsoever to any person or property directly or indirectly arising out of the BUSINESS' operation or the business you conduct pursuant to this Agreement.

16.3. **TAXES.**  We will have no liability for any sales, use, service, occupation, employment related, excise, gross receipts, income, property or other taxes, whether levied upon you or the BUSINESS, in connection with the business you conduct (except any taxes we are required by law to collect from you with respect to purchases from us). Payment of all such taxes are your responsibility.

16.4. **INDEMNIFICATION.**  You agree to indemnify, exculpate, defend and hold us, our affiliates and our respective shareholders, directors, officers, employees, agents, successors and assignees (the "Indemnified Parties") harmless from and against and to reimburse any one or more of the Indemnified Parties for all claims, obligations and

damages described in this Article, any and all taxes described in Article 16.3. and any and all claims and liabilities directly or indirectly arising out of the BUSINESS' operation or your breach of this Agreement.  For purposes of this indemnification, "claims" includes all obligations, liabilities, costs, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses.  We have the right to defend any such claim against us. This indemnity will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

16.5.   **MITIGATION NOT REQUIRED.**  Under no circumstances will we or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate our, their or your losses and expenses, in order to maintain and recover fully a claim against you.  You agree that a failure to pursue such recovery or mitigate a loss will in no way reduce or alter the amounts we or another Indemnified Party may recover from you.

17.   **ENFORCEMENT.**

17.1.   **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.**  Except as expressly provided to the contrary herein, each provision of this Agreement, and any portion thereof, will be considered severable, and if, for any reason, any such provision is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling will not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which will continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid will be deemed not to be a part of this Agreement from the date the time for appeal expires, if you are a party thereto, otherwise upon your receipt from us of a notice of non-enforcement thereof.

17.2.   **LESSER COVENANT ENFORCEABLE.**  If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but would be enforceable by reducing any part or all thereof, you and we agree that such covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law is applicable to the validity of such covenant.

17.3.   **GREATER NOTICE.**  If any applicable and binding law or rule of any jurisdiction requires a greater prior notice than is required hereunder of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or the taking of some other action not required hereunder, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any of Methods of Operation

is invalid or unenforceable the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions hereof, we will have the right in our sole discretion to modify such invalid or unenforceable provision or unenforceable part of Methods of Operation to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any part of Methods of Operation, any portion or portions which a court or arbitrator may hold to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order or arbitration award. Such modifications to this Agreement will be effective only in such jurisdiction, unless we elect to give them greater applicability, and will be enforced as originally made and entered into in all other jurisdictions.

**17.4.** **WAIVER OF OBLIGATIONS.** We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver. Any waiver we grant will be without prejudice to any other rights we may have, will be subject to our continuing review and may be revoked, in our sole discretion, at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

**17.5.** **NON-WAIVER.** We and you will not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including without limitation the right to demand exact compliance with every term, condition and covenant herein or to declare any breach thereof to be a default and to terminate this Agreement prior to the expiration of its term) by virtue of any custom or practice at variance with the terms hereof; our or your failure, refusal or neglect to exercise any right under this Agreement or to insist upon exact compliance by the other with our and your obligations hereunder including without limitation Methods of Operation; our waiver, forbearance, delay, failure, or omission to exercise any right, power or option whether of the same, similar or different nature with respect to other **1-800-WATER DAMAGE** businesses; the existence of other franchise agreements for **1-800-WATER DAMAGE** businesses which contain different provisions from those contained herein; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will constitute a waiver, compromise, settlement, or accord, and satisfaction. We are authorized to remove or obliterate any legend or endorsement, and such legend or endorsement will have no effect.

**17.6.** _**FORCE MAJEURE.**_ Neither we nor you will be liable for loss or damage or deemed to be in breach of this Agreement if our failure to perform our or your obligations results from:

17.6.1 Transportation shortages, inadequate supply of equipment, products, merchandise, supplies, labor, material or energy or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency thereof;

17.6.2. Acts of nature;

17.6.3 Fires, strikes, embargoes, war or riot; or

17.6.4. Any other similar event or cause.

**17.7.   EXTEND PERFORMANCE.**  Any delay resulting from any of said causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that said causes will not excuse payments of amounts owed at the time of such occurrence or payment of Royalties due on any sales thereafter.

**17.8.   OUT OF STOCK AND DISCONTINUED.**  We are not liable to you for any loss or damage, or deemed to be in breach of this Agreement, if we cannot deliver, or cause to be delivered, or if our Affiliates or designated sources or approved suppliers cannot deliver, all of your orders for ancillary goods, merchandise, equipment, supplies, etc., where such things are out-of-stock or discontinued.

**17.9.   COSTS AND ATTORNEYS' FEES.**  If we incur expenses in connection with your failure to pay when due amounts owed to us, to submit when due any reports, information or supporting records or otherwise to comply with this Agreement, you agree to reimburse us for any of the costs and expenses which we incur, including, without limitation, reasonable accounting, attorneys', arbitrators' and related fees.

**17.10.  YOU MAY NOT WITHHOLD PAYMENTS DUE TO US.**  You agree that you will not withhold payment of any amounts owed to us on the grounds of our alleged nonperformance of any of our obligations hereunder.  You agree that all such claims will, if not otherwise resolved by us, be submitted to arbitration as provided in Article 17.12.

**17.11.  RIGHTS OF PARTIES ARE CUMULATIVE.**  Our and your rights hereunder are cumulative, and no exercise or enforcement by us or you of any right or remedy hereunder will preclude our or your exercise or enforcement of any other right or remedy hereunder which we or you are entitled by law to enforce.

**17.12.  DISPUTE RESOLUTION.**

**17.12.1. MEDIATION.**  At our option, all claims or disputes between you and us, or our affiliates arising out of, or in any way relating to this Agreement, or any of the parties respective rights and obligations arising out of this Agreement shall be submitted first to mediation in Seattle, Washington under the auspices of the

National Franchise Mediation Program ("NFMP"), in accordance with NFMP's Commercial Mediation Rules then in effect. Before commencing any legal action against us or our affiliates with respect to any such claim or dispute, you must submit a notice to us which specifies in detail, the precise nature and grounds of such claim or dispute. We will have a period of 30 days following receipt of such notice within which to notify you as to whether we or our affiliates elects to exercise the option to submit such claim or dispute to mediation. You may not commence any action against us or our affiliates with respect to any such claim or dispute in any court unless we fail to exercise our option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of written declaration of the mediator(s) that further mediation efforts are not worth while; or (ii) as a result of a written declaration by us. The parties shall bear their own costs of mediation and shall share equally the filing fee imposed by NFMP and the mediator's fee. Our right to mediate as set forth in this Section may be specifically enforced by us.

**17.12.2 ARBITRATION.** To the extent that any disputes and claims relating to this Agreement or any other agreement entered into between the parties, the rights and obligations of the parties, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement are not settled internally or through mediation, all such disputes and claims shall be settled by arbitration in Seattle, Washington in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). The right and duty of the parties to this Agreement to resolve any disputes by arbitration shall be governed by the Federal Arbitration Act, as amended. The following shall supplement and, in the event of a conflict, shall govern any arbitration: If the claim is for less than $30,000 than the matter shall be heard before a single arbitrator selected from the AAA list of arbitrators. If the claim, or a counterclaim, is for $30,000 or more, the matter shall be heard before a panel of three arbitrators and each party shall appoint its own arbitrator, and the appointed arbitrators shall appoint a "neutral" arbitrator from the AAA's list of arbitrators. Each party must bear its own costs of arbitration including the fee for their respective arbitrator; provided, however, that the neutral or the single arbitrator's fee shall be shared equally by the parties.

17.12.2.1. *Arbitrator's Award.* Whether the matter is heard by a single arbitrator or three, the arbitrator's award shall be rendered within seven-days of the close of the hearing and shall include an award of all fees, costs and attorneys' fees to the prevailing party. The arbitrators shall have no authority to determine class action claims and shall have no authority to amend or modify the terms of the Agreement. To the extent permitted by applicable law, no issue of fact or law shall be given preclusive or collateral estoppel effect in any arbitration, except to the extent such issue may have been determined in another proceeding between the parties. Judgment upon the award of the arbitrator shall be submitted for confirmation to the United States District Court for the Western District of

Washington and, if confirmed, may be subsequently entered in any court having competent jurisdiction. This agreement to arbitrate shall survive any termination or expiration of this Agreement.

17.12.2.2.   *Exclusions.*   Notwithstanding anything to the contrary in this Agreement, we shall not be required to arbitrate the following disputes or claims against you:

17.12.2.2.1.  a collection action of $15,000 or less;

17.12.2.2.2  injunctive claims pursuant to Section 17.21; and

17.12.2.2.3 claims which we may assert against you for indemnification or contribution in any action to which a third party, i.e. not a party to this Agreement or a guarantor of a party's obligations under this Agreement, is a party litigant.

17.12.2.3.  *Third Party Beneficiaries.*  Our officers, directors, shareholders, agents and/or employees are intended third party beneficiaries of this arbitration provision, each having authority to specifically enforce the right to arbitrate claims asserted against such person(s) by you.

**17.13.  <u>GOVERNING LAW.</u>**  All matters relating to arbitration will be governed by the FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 *et. seq.*). Except to the extent governed by the Federal Arbitration Act as required hereby, the UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §§ 1051 *et. seq.)* or other federal law, this Agreement, the franchise and all claims arising from the relationship between us and you will be governed by the laws of Washington, without regard to its conflict of laws, and principles, except that any law regulating the sale of franchises or governing the relationship of a franchisor and its franchisee will not apply unless jurisdictional requirements are met independently without reference to this Article.

**17.14.  <u>CONSENT TO JURISDICTION.</u>**  Subject to Article 17.12. hereof, you and your owners agree that we may institute any action against you or your owners in any state or federal court in Seattle, Washington, and you (and each owner) irrevocably submit to the jurisdiction of such courts and waive any objection you (or her or she) may have to either the jurisdiction of or venue in such courts.

**17.15.  <u>WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL.</u>**  Except with respect to your obligation to indemnify us pursuant to Article 16.4. and 16.5. hereof and claims we bring against you for your unauthorized use of the Marks or unauthorized use or disclosure of any Confidential Information, we and you and your respective owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us, the party making a claim will be limited to equitable relief and to recovery of any actual

damages it sustains.   We and you irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either of us. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

17.16. **BINDING EFFECT.**  This agreement is binding upon us and you and our respective executors, administrators, heirs, beneficiaries, assigns and successors in interest and may not be modified except by written agreement signed by you and us.

17.17. **LIMITATIONS OF CLAIMS.**  Except for claims arising from your nonpayment or underpayment of amounts you owe us pursuant to this Agreement, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless a judicial or arbitration proceeding is commenced within (i) two years after the act, transaction or occurrence upon which such action is based; or (ii) the expiration of one year after the complaining party becomes aware of facts or circumstances reasonably indicating that such party may have a claim against the other party hereunder, whichever occurs first.   Any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off.

17.18. **CONSTRUCTION.**  The preambles and appendices are a part of this Agreement which, together with the Operations Manual and our other written policies, constitutes our and your entire agreement except as provided below, and there are no other oral or written understandings or agreements between us and you relating to the subject matter of this Agreement, except that you acknowledge that we justifiably have relied on your representations made prior to the execution of this Agreement as set forth in Article 1 hereof.  Except as contemplated by the arbitration provisions of Article 17.12. hereof, nothing in this Agreement is intended, nor is deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

17.19. **WITHHOLD APPROVAL.**   Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed or effected actions that require our approval.

17.20. **THIRD PARTY BENEFICIARIES.**   Our officers, directors, shareholders, agents and/or employees are express third party beneficiaries of this Agreement and the arbitration provisions contained in this Agreement, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

17.21. **INJUNCTIVE RELIEF.**  Nothing contained in this Agreement shall prevent us from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief

available to safeguard and protect our interest prior to the filing of any arbitration proceeding or pending the trial or handing down of a decision or award pursuant to any arbitration proceeding conducted under this Agreement.

17.22. **HEADINGS.** The headings of the several Articles hereof are for convenience only and do not define, limit or construe the contents of such Articles.

17.23. **WE, US, OUR.** Unless expressed to the contrary, references in this Agreement to "we," "us" and "our," with respect to all of our rights and all of your obligations to us under this Agreement, will be deemed to include any of our affiliates with whom you deal. The term "affiliate," as used herein with respect to you or us, means any person or entity directly or indirectly owned or controlled by, under common control with or owning or controlling you or us. For purposes of this definition, "control" means the power to direct or cause the direction of management and policies.

17.24. **JOINT AND SEVERAL OWNERS' LIABILITY.** If two or more persons are at any time the owner of the BUSINESS hereunder, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several. References to "owner" mean any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in you (or a transferee of this Agreement and the BUSINESS or an interest in you) including without limitation, any person who has a direct or indirect interest in you (or a transferee), this Agreement, the Franchise or the BUSINESS and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, equitable interest or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets thereof. References to a "controlling interest" in you mean thirty three and one-third (33.33%) percent or more of your voting shares or other voting rights if you are a corporation or partnership owned by three (3) or more persons; otherwise, fifty (50%) percent or more of your voting shares or other voting rights will constitute a "controlling interest." "Person" means any natural person, corporation, general or limited partnership, unincorporated association, cooperative or other legal or functional entity.

17.25. **"BUSINESS".** The term "BUSINESS" as used herein includes all of the assets of the **1-800-WATER DAMAGE** business you operate pursuant to this Agreement, including its revenue and income.

17.26. **MULTIPLE COPIES.** This Agreement may be executed in multiple copies, each of which will be deemed an original.

17.27. **POWER OF ATTORNEY.** Wherever in this Agreement you have covenanted and agreed to execute any instrument or document and you do not comply with such provisions, you hereby irrevocably nominate, constitute and appoint our president ("President") from time to time as our true and lawful attorney for you and in your name and your behalf to execute and do all such acts, deeds, assurances, conveyances, transfers, instruments, documents and things that may be required for all or any of the

purposes aforesaid, and you hereby covenant and agree for you and your successors and assigns to allow, ratify and confirm whatsoever our President shall do or cause to be done by virtue of this power of attorney.

**17.28.** **"CORPORATION OR PARTNERSHIP".** The term "corporation or partnership" as used herein to describe your business entity shall, if applicable, include reference to your formation as a limited liability company, limited liability partnership, or any other type of limited liability entity.

## 18. NOTICES AND PAYMENTS.

**18.1.** **NOTICES.** All written notices and reports permitted or required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered:

18.1.1. At the time delivered by hand;

18.1.2. One (1) business day after transmission by telecopy, facsimile or other electronic system;

18.1.3. One (1) business day after being placed in the hands of a commercial courier service for next business day delivery; or

18.1.4. Three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified. Any required payment or report which we do not actually receive during regular business hours on the date due (or postmarked by postal authorities at least two (2) days prior thereto) will be deemed delinquent.

**18.2.** **PAYMENTS.** All payments required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered as provided in Article 18.1. above as well as by bank-wire transfer upon telephone or electronic confirmation with the receiving bank.

## 19. MISCELLANEOUS.

**19.1.** **NO AUTHORITY.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE US EXCEPT AN OFFICER AUTHORIZED BY US IN A WRITTEN DOCUMENT. YOU ACKNOWLEDGE THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY OR ON BEHALF OF US WHICH HAVE LED YOU TO ENTER INTO THIS AGREEMENT. YOUR SUCCESS AS A FRANCHISEE IS LARGELY DEPENDENT UPON YOUR EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF YOUR EMPLOYEES, MARKET

CONDITIONS AND VARIABLE FACTORS BEYOND OUR CONTROL OR INFLUENCE. YOU ACKNOWLEDGE THAT SOME FRANCHISEES ARE MORE, OR LESS, SUCCESSFUL THAN OTHER FRANCHISEES AND THAT WE HAVE MADE NO REPRESENTATION THAT YOU WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.2. **RECEIPT**. YOU ACKNOWLEDGE RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND EXHIBITS, AT LEAST 5 BUSINESS DAYS PRIOR TO THE DATE YOU SIGN IT. IN ADDITION, YOU ACKNOWLEDGE RECEIPT OF OUR UNIFORM FRANCHISE OFFERING CIRCULAR AT LEAST 10 BUSINESS DAYS (14 CALENDAR DAYS FOR ILLINOIS FRANCHISEES) PRIOR TO THE EXECUTION OF THIS AGREEMENT OR YOUR PAYMENT OF ANY MONIES TO US, REFUNDABLE OR OTHERWISE.

19.3. **OPPORTUNITY FOR REVIEW BY YOUR ADVISORS.** WE RECOMMEND AND GRANT YOU AN OPPORTUNITY TO OBTAIN A REVIEW OF THIS AGREEMENT AND OUR UNIFORM FRANCHISE OFFERING CIRCULAR BY YOUR LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION.

**[THE SPACE BELOW IS LEFT BLANK INTENTIONALLY]**

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement on the date stated on the first page hereof.

THE CURE SERVICE GROUP, INC.

By: _Lisa Bong_

Name Printed: _Lisa Bong_

Title: _President_

Dated: _3/2/06_

*EACH OF THE UNDERSIGNED PARTIES WARRANTS AND REPRESENTS THAT HE/SHE HAS NOT RELIED UPON ANY GUARANTEES CONCERNING REVENUE, PROFIT OR THE SUCCESS OF THIS FRANCHISE IN SO SIGNING.*

[OWNER CORPORATION OR PARTNERSHIP]

By: _____

Name Printed: _____

Title: _____

Dated: _____

*As Individuals:*

_Marian M Morrow_

Name Printed: MARIAN M MORROW

Dated: _3/2/06_

_Shelly D Seese_

Name Printed: Shelly D. Seese

Dated: _3/2/06_

_Thomas E Lavender_

Name Printed: Thomas F Lavender

Dated: _3/2/06_

**RECEIPT**
**1-800-WATER DAMAGE**

THIS OFFERING CIRCULAR SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING AND ALL AGREEMENTS CAREFULLY.

IF THE CURE SERVICE GROUP, INC. OFFERS YOU A FRANCHISE, THE CURE SERVICE GROUP, INC. MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:

(1) THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR

(2) TEN BUSINESS DAYS (14 CALENDAR DAYS IN ILLINOIS) BEFORE THE SIGNING OF A BINDING AGREEMENT; OR

(3) TEN BUSINESS DAYS (14 CALENDAR DAYS IN ILLINOIS) BEFORE A PAYMENT TO THE CURE SERVICE GROUP, INC..

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN A FRANCHISE AGREEMENT.

IF THE CURE SERVICE GROUP, INC. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND ANY GOVERNING STATE AGENCY.

I HAVE RECEIVE A 2005 1-800-WATER DAMAGE OFFERING CIRCULAR, INCLUDING A DISCLOSURE DOCUMENT AND THE FOLLOWING EXHIBITS:

A.   FRANCHISE AGREEMENT (INCLUDING APPENDICES AND ADDENDA)
B.   FINANCIAL STATEMENTS
C.   AGENTS FOR SERVICE OF PROCESS - EFFECTIVE DATES (STATE ADMINISTRATORS, IF ANY)
D.   FRANCHISE LOCATIONS
E.   STATE SPECIFIC ADDENDA TO OFFERING CIRCULAR
F.   BROKER EXHIBIT
G.   OPERATIONS MANUAL TABLE OF CONTENTS
H.   RECEIPTS

Prospective Franchisee

Date  Jan 18th 2006
Franchisee  Shelly Diese

Date  Jan 18th 2006
Franchisor  Dan Diese

**FRANCHISOR'S COPY**

Receipt



## RECEIPT OF FRANCHISE-RELATED DOCUMENTS

The undersigned, personally and/or as an officer or partner of the proposed franchisee, does hereby acknowledge receipt, in form for execution, of the 1-800 Water Damage Franchise Agreement and supporting documents.

I further acknowledge my understanding that it is my responsibility, individually, and/or as an officer or partner of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to the execution thereof.

A FEDERAL TRADE COMMISSION RULE REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED. **PLEASE DO NOT SIGN OR RETURN THE FRANCHISE AGREEMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.**

**Date of Receipt:** _2/15/06_

Future Franchisee: _Marion Monn_ Future Franchisee: _Shelly D Suse_

Future Franchisee: _Thomas Journel_ Future Franchisee: _____

<u>APPENDIX "A"</u>

**TO THE FRANCHISE AGREEMENT
BETWEEN THE CURE SERVICE GROUP, INC.**

AND

**MARIAN MORROW, SHELLY SEESE, AND TOM LAVENDER**

DATED __3 / 2__, 200_6_

Effective Date: This Appendix A is current and complete
as of ___3 | 2___, 200_6_

### 19.    <u>FORM OF OWNER.</u>

**19.1.   <u>PROPRIETORSHIP.</u>** Your owner(s) (is/are) as follows: Marian    Morrow,    Shelly
Seese, and Tom Lavender.

**19.2.   <u>CORPORATION OR PARTNERSHIP.</u>** You were incorporated or formed on
_____, 200__, under the laws of the State of _____. You have not
conducted business under any name other than your corporate or partnership name. The
following is a list of your directors, if applicable, and officers as of the effective date
shown above:

**Name of Each Director/Officer**                              **Position(s) Held**

_____              _____

_____              _____

_____              _____

**19.3.   <u>Owners.</u>** The following list includes the full name and mailing address of each person
who is one of your owners (as defined in the Franchise Agreement) and fully describe the
nature of each owner's interest.

| Owner's Name and Address | Description of Interest (Must total 100%) |
|---|---|
| **Marian Morrow** 201 Blair Dr. Yorktown Va | 51% |
| **Shelly Seese** 23642 | 24.5% |
| **Tom Lavender** | 24.5% |

**IN WITNESS WHEREOF,** the parties hereto have executed this Appendix "A" to the Franchise Agreement on the date(s) set forth below.

THE CURE SERVICE GROUP, INC.

By: _Lisa Bongi_

Name Printed: _Lisa Bongi_

Title: _President_

[OWNER CORPORATION OR PARTNERSHIP]

By: _____

Name Printed: _____

Title: _____

Dated: _____

*As Individuals*:

_Marian M Morrow_

Name Printed: _MARIAN M MORROW_

Dated: _3/2/06_

_Shelly D Seese_

Name Printed: _Shelly D Seese_

Dated: _3/2/06_

_Thomas E Lavender_

Name Printed: _Thomas E Lavender_

Dated: _3/2/06_

**APPENDIX "B"**

**TO THE FRANCHISE AGREEMENT
BETWEEN THE CURE SERVICE GROUP, INC.**

AND

**MARIAN MORROW, SHELLY SEESE, AND TOM LAVENDER**

DATED _3/2_, 200_6_

**20.  GUARANTY AND ASSUMPTION OF OBLIGATIONS.**

**20.1.  PARTIES.**  THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS (the "Guaranty") is given this _2nd_ day of _March_, 200 _6_, by Marian Morrow, Shelly Seese, and Tom Lavender.

**20.2.  GUARANTEES.**  In consideration of, and as an inducement to, the execution of the Franchise Agreement (the "Agreement") dated _3/2/06_ between Marian Morrow, Shelly Seese, and Tom Lavender ("Franchisee") and us, each of the undersigned (the "Undersigned") hereby personally and unconditionally:

    20.2.1. Guarantees to us and our successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that, Marian Morrow, Shelly Seese, and Tom Lavender will punctually pay and perform and satisfy each and every obligation, undertaking, agreement and covenant of Franchisee set forth in the Agreement; and

    20.2.2. Agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities.

**20.3.  CONSENT AND AGREEMENT.**  Each of the Undersigned consents and agrees that:

    20.3.1. His direct and immediate liability under this Guaranty will be joint and several;

    20.3.2. He will render any payment or performance required under the Agreement upon demand if owner fails or refuses, for any reason, punctually to do so;

    20.3.3. Such liability will not be contingent or conditional upon our pursuit of any remedies against owner or any other person; and

20.3.4. Such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this guaranty, which will be continuing and irrevocable during the term of the Agreement and thereafter.

**20.4.** **WAIVERS.** Each of the Undersigned waives all rights to payments and claims for reimbursement or subrogation which any of the Undersigned may have against owner arising as a result of the Undersigned's execution of and performance under this Guaranty.

**IN WITNESS WHEREOF**, each of the Undersigned has affixed his signature on the same day and year as the Agreement was executed.

GUARANTOR(S)

_Marion M Monroe_

Name Printed: _MARIAN M MORROW_

_Shelly D Seese_

Name Printed: _Shelly D. Seese_

_Thomas E Lavender_

Name Printed: _Thomas E Lavender_

Name Printed: _____

Name Printed: _____

Name Printed: _____

## APPENDIX "C"

### TO THE FRANCHISE AGREEMENT
### BETWEEN THE CURE SERVICE GROUP, INC.
AND
### MARIAN MORROW, SHELLY SEESE, AND TOM LAVENDER
DATED 3/2 , 2006
### MARKETING AREA.

**DEFINITION.** The Marketing Area referred to in Article 1.7. of the Franchise Agreement shall be as follows:

Zip Codes in the state of OH: 43920, 43930, 43932, 43945, 43962, 43968, 44401, 44405, 44406, 44408, 44412, 44413, 44415, 44416, 44422, 44423, 44425, 44427, 44429, 44431, 44432, 44436, 44437, 44440, 44441, 44442, 44443, 44444, 44445, 44449, 44451, 44452, 44454, 44455, 44460, 44471, 44481, 44490, 44492, 44493, 44501, 44502, 44503, 44504, 44505, 44506, 44507, 44509, 44510, 44511, 44512, 44513, 44514, 44515, 44555, 44601, 44609, 44619, 44625, 44634, 44657, 44665, 44672, 45684.

**AS OF TODAY.** If the Marketing Area is identified by counties or other political subdivisions, political boundaries shall be considered fixed as of the date of this Agreement and shall not change for the purpose hereof, notwithstanding a political reorganization or change to such boundaries or regions. All street boundaries shall be deemed to end at the street center line unless otherwise specified above.

The Cure Service Group, Inc.

By: _Lisa Bovy_

Title: _President_

Dated: _3/2/06_

[OWNER CORPORATION OR PARTNERSHIP]

By: _____

Title: _____

Dated: _____

As Individuals:

_Marian M Morrow_
Dated: _3/2/06_
_Shelly J Seese_
Dated: _3/2/06_
_Thomas E Lavender_
_3/2/06_

## APPENDIX "D"

### TO THE FRANCHISE AGREEMENT
### BETWEEN THE CURE SERVICE GROUP, INC.
AND
### MARIAN MORROW, SHELLY SEESE, AND TOM LAVENDER

DATED __3/2____, 200*6*

### MINIMUM REVENUE REQUIREMENTS.

**Your minimum gross revenue for the first year is $0.80 x 185,813 homes and commercial buildings which equals $148,650.40. Your minimum gross revenue for the second year and every year thereafter is $1.60 x 185,813 homes and commercial buildings which equals $297,300.80.**

Franchisee:

By: _____

Title: _____

Dated: _____

As Individuals:

_Marian M Morrow_

Date: __3/2/06__

_Shelly D Seese_

Date: __3/2/06__

_Thomas E Lavender_

__3/2/06__

## APPENDIX "E"

### TO THE FRANCHISE AGREEMENT
### BETWEEN THE CURE SERVICE GROUP, INC.
AND
### MARIAN MORROW, SHELLY SEESE, AND TOM LAVENDER

DATED __3/2__, ~~2005~~ 2006

### CONDITIONAL ASSIGNMENT
### OF FRANCHISEE'S TELEPHONE NUMBERS

1.    Marian Morrow, Shelly Seese, and Tom Lavender, ("Assignor"), in exchange for valuable consideration provided by The Cure Service Group, Inc. ("Assignee"), receipt of which is hereby acknowledged, hereby conditionally assigns to Assignee all telephone numbers and listings utilized by Assignor in the operation of its **1-800-WATER DAMAGE** Business at the location and in the territory designated in the Franchise Agreement. Those numbers are as follows: 1-800-WATER-DAMAGE.

2.    The conditional agreement will become effective automatically upon termination of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company to assure the effectiveness of the assignment of telephone numbers as if the Assignee had been originally issued such telephones, telephone numbers, telephone listings and the usage thereof.

3.    Assignor agrees to pay the telephone company on or before the effective date of assignment all amounts owed for the use of the telephone number(s) including, without limitation, Yellow Pages advertising. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this agreement, and agrees to fully cooperate with the telephone company and Assignee in effectuating this assignment.

ASSIGNOR:

BY _Marian M Morrow_
   _Shelly J Seese_

TITLE: _Owner_

Date: _3/2/06_
_Thomas E Lavender_

ASSIGNEE:

The Cure Service Group, Inc.                    Attest:

By: _Lisa Bany._                    _____

## APPENDIX G

## ADDENDUM (RE CONSENT TO TRANSFER)
## RELATING TO
## 1-800-WATER DAMAGE
## FRANCHISE AGREEMENT

THIS ADDENDUM (Addendum) is made and entered into on _3/2_____, 20 _0e_, by The Cure Service Group, Inc. (Franchisor), and Marian Morrow, Shelly Seese, & Tom Lavender, located at _____( Franchisee).

**Recitals.** Franchisor and Franchisee entered into a Franchise (or License) Agreement on _3/2_____, 200_6_, (Franchise Agreement). The Franchisee agreed among other things to operate and maintain a franchise located at _____ designated by Franchisor as Unit #_____ (Unit). Franchisee has obtained from a lender a loan (Loan) in which funding is provided with the assistance of the United States Small Business Administration (SBA). SBA requires the execution of this Addendum as a condition for obtaining the SBA assisted financing.

NOW, THEREFORE, in consideration of the mutual promises below, and for good and valuable considerations in hand paid by each of the parties to the others, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

- The Franchise Agreement is in full force and effect, and Franchisor has sent no official notice of default to Franchisee under the Franchise Agreement that remains uncured on the date hereof.

- Franchisor will not unreasonably withhold, delay or condition its consent to any proposed transfer or assignment by Franchisee which requires Franchisor's consent under Section 12 of the Franchise Agreement.

- This Addendum automatically terminates on the earliest to occur of the following: (i) a Termination occurs under the Franchise Agreement; (ii) the Loan is paid; or (iii) SBA no longer has any interest in the SBA financing.

IN WITNESS WHEREOF, the parties hereto have duly signed and executed this Addendum as of the day and year first above written.

**FRANCHISOR:**

By: _Lisa Bong_

Print Name: _Lisa Bongi_

Title: _President_

**FRANCHISEE:**

By: _Marian M Morrow_

Print Name: _MARIAN M MORROW_

Title: _____

_Shelly D. Seese_

_Thomas E Lavender_

# APPENDIX I

## ACKNOWLEDGEMENT ADDENDUM TO
## FRANCHISE AGREEMENT

<u>NOTE</u>: Please read and understand this Addendum in its entirety. As you know, you and we are entering into a Franchise Agreement for the operation of a 1-800-WATER DAMAGE™ franchise. The purpose of this Acknowledgement Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Further, we also want to confirm that you are not relying on any unauthorized statements or promises. Please review each of the following questions carefully and provide honest responses to each question.

### <u>Acknowledgements and Representations*</u>.

1.   Did you receive a copy of our Offering Circular (and all exhibits and attachments) at least 10 business days prior to signing the Franchise Agreement? Check one: (✓) Yes (__) No. If no, please comment: _____
_____.

2.   Have you studied and reviewed carefully our Offering Circular and Franchise Agreement? Check one: (✓) Yes (__) No. If no, please comment: _____
_____.

3.   Did you receive a copy of the Franchise Agreement at least 5 business days prior to the date on which the Franchise Agreement was executed? Check one: (✓) Yes (__) No. If no, please comment: _____
_____.

4.   Did you understand all the information contained in both the Offering Circular and Franchise Agreement? Check one: (✓) Yes (__) No. If no, please comment: _____
_____.

5.   Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Offering Circular? Check one: (✓) No (__) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____
_____.

6.   Did any employee or other person speaking on behalf of The Cure Service Group, Inc. make any oral, written or visual claim, statement, promise or representation to you that stated, suggested, predicted sales, revenues, expenses, earnings, income or profit levels at any 1-800-WATER DAMAGE™ location or business, or in the likelihood of success at your franchised business? Check one: (✓) No (__) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____

_____
_____

7.  Did any employee or other person speaking on behalf of The Cure Service Group, Inc. make any statement or promise regarding the costs involved in operating a franchise that is not contained in the Offering Circular or that is contrary to, or different from, the information contained in the Offering Circular. Check one: (__) Yes (✓) No. If yes, please comment: _____

_____
_____

8.  Do you understand that the franchise granted is for the right to market your business in an exclusive marketing area only and includes no exclusive area or protected territory, and that we, our affiliates, and franchisees have the right, under certain circumstances, to sell products and perform services or permit others to sell products and perform services, including using the 1-800-WATER DAMAGE marks, in or near your Marketing Area? Check one: (✓) Yes (__) No. If no, please comment: _____

_____
_____

9.  Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise for the Business, meaning that any prior oral or written statements not expressly stated in the Franchise Agreement will not be binding and you must not rely on any such statements? Check one: (✓) Yes (__) No. If no, please comment: _____

_____
_____
____.

10. Do you understand that the success or failure of your Business will depend in large part upon your skills and experience, your business acumen, the local market for products under the 1-800-WATER DAMAGE™ trademarks, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors? Further, do you understand that the economic and business factors that exist at the time you open your business may change? Check one (✓) Yes (__) No. If no, please comment: _____

_____

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS. IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH.

**NOTE: IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, EACH OF ITS OWNERS MUST EXECUTE THIS ACKNOWLEDGEMENT.**

Signed: _Marian M Morrow_                    Signed: _Shelly D Seese_
Print Name: _MARIAN M MORROW_                Print Name: _Shelly D Seese_
Date: _8/2/06_                               Date: _3/2/06_

_Thomas E Lavender_
_Thomas E Lavender_
_3/2/06_

**APPROVED ON BEHALF OF**
**THE CURE SERVICE GROUPS INC.**

Signed: _____                      Signed: _Lisa Bongi_
Print Name: _____                  Print Name: _Lisa Bongi_
Date: _____                        Date: _3/2/06_